UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-440-H

DANA BOWERS                                                    PLAINTIFF

V.

WINDSTREAM KENTUCKY EAST, LLC., *et. al.*                     DEFENDANTS


## MEMORANDUM OPINION

Plaintiff, Dana Bowers ("Bowers") brings this putative class action lawsuit alleging that

Defendants Windstream Kentucky East, LLC ("Windstream East"), Windstream Kentucky West,

LLC ("Windstream West"), and Windstream Communications, Inc. ("Windstream

Communications") (collectively, "Windstream" or "the Windstream companies"), overcharged

her for monthly telecommunications services and included misleading statements on her bills, in

violation of various federal and state statutes and common law. The matter is before the Court on

Defendants' Motion to Dismiss or Stay.

On April 20, 2010, the Court conducted an hearing to discuss the various issues and to

clarify certain arguments the briefs presented. This case raises interesting questions about the

proper forum for resolving disputes over regulated utility tariffs. These questions are crystalized

in the Court's application of the judicial doctrine of primary jurisdiction. For the reasons set

forth below, the Court will partially grant Defendants' motion by staying Count III. The Court

will deny the remainder of Defendant's Motion to Dismiss or Stay.[1]

I.

Plaintiff Bowers is a residential customer of Windstream East, a telecommunications company.[2]  Windstream East is affiliated with telecommunications companies Windstream West and Windstream Communications.[3]  Collectively, the Windstream companies provide services to hundreds of thousands of Kentucky customers in forty-plus counties. Plaintiff filed this putative class action in June 2009, alleging that for the two years prior to the Complaint, the Windstream companies overcharged her and other customers and used misleading descriptions of certain charges on their bills.  Specifically, Bowers alleges that the Windstream companies charged customers for a tax imposed by Kentucky statute without updating their "tariffs," or schedules of rates on file with the Federal Communications Commission ("FCC") and the Kentucky Public Service Commission ("PSC").  Furthermore, Bowers claims that even after the Windstream companies updated their tariffs, they charged more than those tariffs allowed. Bowers also alleges that the manner in which the Windstream companies described and applied their charges was misleading and violated federal and state law.

This case involves a regulatory system established to govern telecommunications company charges.  The Court will address that broad regulatory framework next.

---

[1] If it becomes clear, at a later point in this litigation, that a stay is appropriate because of new facts or legal questions, the Court will revisit its decision at that time.

[2] For the purposes of this motion, the Court assumes the truth of Plaintiff's factual allegations. *Minger v. Green*, 239 F.3d 793, 797 (6th Cir. 2001), citing *Gao v. Jenifer*, 185 F.3d 548, 552 (6th Cir. 1999).

[3] The Windstream Defendants are "affiliates" within the meaning of 47 U.S.C. § 153(1).

A.

Windstream East, Windstream West and Windstream Communications provide various interstate and intrastate telecommunications services. As such, The Federal Communications Act of 1934 ("the Communications Act"), 47 U.S.C. § 151 *et seq*., regulates some of their interstate services. Section 203(a) of that Act requires that the companies file schedules with the Federal Communications Commission, ("FCC"), describing, among other things, all of the rates and charges for their services. These schedules, commonly called tariffs, are public documents "that set[] forth the services offered by a telecommunication carrier, the fees charged for those services, and the terms on which those services are offered." *AT&T Commn's of S. States, Inc. v. BellSouth Telecomm., Inc.,* 268 F.3d 1294, 1296 n. 4 (11th Cir. 2001). The FCC tariffs control the rights and liabilities for interstate services between the Windstream companies and their customers. Section 203(c) of the Communications Act states that "no carrier shall (1) charge, demand, collect or receive a greater or less or different compensation ... than the charges specified in the schedule then in effect." 47 U.S.C. § 203(c).

The Windstream companies also provide intrastate telecommunications services. The Kentucky Public Service Commission ("PSC" or "Kentucky PSC") regulates the rates for some of those services. Like federal tariffs, PSC tariffs for intrastate services control the rights and liabilities between the Windstream companies and their customers. KRS § 278.160(2) states that "[n]o utility shall charge, demand, collect, or receive from any person a greater or less compensation for any service rendered or to be rendered than that prescribed in its filed schedules... ."

3

B.

To give proper context to the Complaint, the Court will describe the events predating the disputed charges. In 2005, Kentucky's legislature enacted a statute that imposed a 1.3% tax on the gross revenues of telecommunications providers, including the Windstream companies. *See* KRS § 136.616. As originally passed, the statute prohibited telecommunications providers from collecting the tax directly from the customer or separately stating the tax on the customer's bill. KRS § 136.616(3). No one challenged Kentucky's right to impose the tax or the providers' right to pass it on to their customers. The telecom companies did object, however, to the provision prohibiting them from adding a line item to their bills explaining why they had raised prices. *Id.*

In short order, the telecom companies challenged the constitutionality of the provision in federal court. In February 2007, the Eastern District of Kentucky struck down the no-stating-the-tax provision, after finding that it prohibited more speech than necessary and thus violated the First Amendment's free speech protections. *Bellsouth Telecomm., Inc. v. Farris*, 2007 U.S. Dist. LEXIS 13993 (E.D. Ky. 2007), *aff'd in part and reversed in part by* 542 F.3d 499 (6th Cir. 2008). The Sixth Circuit later affirmed that decision. *Id.*

On June 22, 2007, after the courts invalidated the Kentucky statutory provision, the Windstream companies began adding the pass-through tax, which they called the "Kentucky Gross Receipts Surcharge" (hereinafter "Surcharge" or "Kentucky Surcharge"), to their customers' bills.[4] A one-time statement on the June 22 bill said that "[e]ffective with this billing statement, the Kentucky Gross Receipts Surcharge will begin appearing on your bill. This

---

[4] The exhibits to the pleadings only show the Windstream East statements. The Court presumes, for the purposes of its analysis here, that the Windstream West and Windstream Communications bills used the same language.

4

surcharge recovers a tax imposed by the state of Kentucky on all communications and entertainment providers." On the June 22 bill and all future bills, Windstream listed some portion of the Surcharge as a "Regulated" cost, and another portion of the Surcharge as a "Deregulated" cost. A recurring note labeled "Gross Receipts Tax/Surcharge" in the "Taxes, Surcharges and Fees" Section of each bill stated: "This charge recovers for a tax that is imposed either on Windstream or on customers directly by various states for the provision of communications services. In the case of gross receipts surcharges, they are not government mandated charges."

Irrespective of the disclosures on the customer bills, Plaintiff notes that the pertinent federal and state tariffs did not give Defendants the authority to charge the taxes to customers under any circumstances. Though the Windstream companies added the Surcharge to customers' bills in June 2007, they did not list the Surcharge on their federal tariffs until August 7, 2008.[5] The Windstream companies never added the Surcharge to their Kentucky tariffs.

Additionally, Plaintiff claims that even after the Windstream companies added the Surcharge to their federal tariffs, the companies charged their customers more than the 1.3% imposed upon them by the state of Kentucky. Plaintiff also alleges that Windstream's bills added the Surcharge to services that were not taxed under the Kentucky statute, including internet and cable services.

Thus, on June 22, 2009 Plaintiff filed her Complaint seeking (1) damages in the amount

---

[5] When it was added, the Kentucky Surcharge was provided for in Section 2.4.1 of Windstream's FCC tariffs, under "Taxes, Fees and Surcharges." It reads: "There shall be added to the customer's bills, as a separate item, an amount equal to the proportionate part of any license, occupation, franchise, or other similar fee or tax or cost of a tax not or hereafter imposed upon the Telephone Company's interstate revenues by a taxing jurisdiction, and which fee or tax is based upon a percentage of the interstate receipts of the Telephone Company. Where more than one such fee or tax is imposed, each of the charges or taxes applicable to a customer shall be added to the customer's bill as separately identified items. Such taxes or fees will not be applied to the Federal Universal Service Fee or Lifeline services. The taxing jurisdiction and applicable factors are as follows: Kentucky (Gross Revenues Tax Surcharge) 1.31%.

of the overcharge, (2) an injunction against the Windstream companies and (3) an award of attorney's fees.

## II.

The parties dispute whether Defendants Windstream West and Windstream Communications are properly before the Court. As noted above, Plaintiff asserts claims against Windstream East, Windstream West and Windstream Communications; even though she is only a customer of Windstream East and has no relationship with the other companies. She contends that the "juridical link" doctrine allows her to join the other Defendants, especially where, as here, the companies are affiliated and operate under the same billing policy. Defendants argue that the doctrine does not apply and that the Court should dismiss claims against Windstream West and Windstream Communications.

To have standing, Plaintiff must (1) have suffered an actual, concrete and particularized "injury in fact" that (2) has a causal connection with Defendant's action and (3) is redressable in court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Though Plaintiff fails the second and third prongs of the test, she asserts that the "juridical link doctrine," discussed in *Thompson v. Board of Education of the Romeo Community Schools,* serves as an exception to the typical rules of standing. 709 F.2d 1200, 1204-05 (6th Cir. 1983). The *Thompson* case involved gender discrimination claims by 22 female school teachers against various school boards based on the boards' treatment of pregnancy leave. *Id.* at 1200. There, the Sixth Circuit cited two limited exceptions to the rule requiring each plaintiff in a class to have a cause of action against each defendant:

> (1) Situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hand the class suffered injury; and

> (2) Instances in which all defendants are *juridically related* in a manner that suggests a single resolution of the dispute would be expeditious.

*Id.* (emphasis in original) citing *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 462 (9th Cir. 1973). The Court went on to say that the juridical link doctrine is most often applied "[w]here all the members of the defendant class are officials of a single state and are charged with enforcing or uniformly acting in accordance with a state statute, or common rule or practice of state-wide application, which is alleged to be unconstitutional." *Id.* at 1205 (citing *Mudd v. Busse*, 68 F.R.D. 522, 527-28 (N.D. Ind. 1975). Ultimately, the *Thompson* court refused to apply the juridical link doctrine because the facts of its case did not involve a state statute or uniform policy being applied statewide by defendants. *Id.* at 1205. Outside of the *Thompson* case, the Sixth Circuit has not addressed the juridical link doctrine at length.[6]

Rather than apply the seemingly narrow juridical link doctrine to circumstances in which the Court has little information, the Court will address the standing issue in a more straightforward fashion. Plaintiff will have until July 1, 2010, to find and join additional Plaintiffs who are customers of Windstream West and Windstream Communications. In the interim, the Court will only address Plaintiff's claims against Windstream East.

## III.

Defendants' first argue that the doctrine of primary jurisdiction requires the Court to stay the action or dismiss Plaintiff's claims. The Complaint warrants a stay or dismissal, Defendants say, because it implicates matters that should be decided in the first instance by either the FCC or

---

[6] Both parties reference *Fallick v. Nationwide Mutual Insurance Co.,* 162 F.3d 410, 421. *Fallick* is dissimilar to the case at hand because it involved only one defendant, Nationwide, against whom the plaintiff had a cause of action. Here, Bowers seeks to maintain a cause of action against affiliated companies, when she is only a customer of one.

the PSC.

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *U.S. v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 64. The Supreme Court has said there is no defined formula for when a court should apply the doctrine. It stated:

> In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. *See Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426. More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. *See Far East Conference v. United States*, 342 U.S. 570.

*Id.*

In the context of tariffs, the Supreme Court has said that courts should not make tariffs, but may, in certain circumstances, construe them. *Id.* at 66. Specifically, a court may construe a tariff if doing so is solely an issue of law. *Id.* Where construction requires factual determinations and discretion in technical matters, a court should defer to the appropriate agency. *Id., citing Great N. R. Co. v. Merchants Elevator Co.*, 259 U.S. 285-91. The Supreme Court went on to say that "[c]ertainly there would be no need to refer the matter of construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has

clarified the factors underlying it." *Id.* at 69, citing *Crancer v. Lowden*, 315 U.S. 631.

Thus, the Court will consider whether the relevant regulatory agencies have already spoken on the issues raised in each of Plaintiff's claims, and if not, whether the questions presented here require deferral for some other reason, such as the need to promote uniformity or to have the question heard by a decision maker with specialized knowledge.

## A.

In Count I, Plaintiff asserts that Windstream East overcharged her for telecommunications services in violation of 47 U.S.C. § 203(c). She claims that: (1) prior to August 2008, Windstream East overcharged her because its FCC tariffs did not include a provision for the Kentucky Surcharge; and (2) after August 2008, Windstream East overcharged her by charging more than the 1.3% that its federal tariff allowed for the Kentucky Surcharge. Each of Plaintiff's overcharge claims are premised on the "Filed Rate Doctrine" which says that a telecommunications carrier's filed tariff contains the only lawful rate that a carrier may charge for a service. Specifically, 47 U.S.C. § 203(c), reads "no carrier shall ... charge, demand, collect or receive a greater or less or different compensation for such communication or for any service in connection therewith" other than "the charges specified in the schedule then in effect."

Plaintiff argues that primary jurisdiction should not apply because the FCC tariff is unambiguous and because the FCC, in *In the Matter of Irwin Wallace v. AT&T Communications of the Southern States, Inc.*, has already determined that a telecommunications company may not pass along a tax until the company's tariff actually authorizes the pass-through tax. 6 FCC Rcd 1618 (1991), *on reconsideration*, 7 FCC Rcd 3333 (1992). The *Irwin Wallace* opinion distinguished taxes imposed directly on the customer and taxes that are imposed on the

telecommunications carrier, but are permitted to be passed onto the customer. 6 FCC Rcd 1618 (1991) at ¶ 6.  The utility can apply the former without any mention in a tariff; it cannot pass along its own taxes, however, without specific tariff authority.  *Id.* The *Irwin Wallace* opinion concluded that a tax applied to a telecommunications carrier was not "extrinsic," but rather was "one of the many expenses affecting the carrier's charges to its customers."  *Id.*  Accordingly, the FCC found that "imposition of a gross receipts tax surcharge on the end use before the tariff authorizing such a charge became effective was a violation of Section 203 of the Act." *Id.* (footnotes omitted).

The plain language of 203(c) and the FCC's decision in *Irwin Wallace* indicates that Windstream may not pass on a tax imposed directly upon it without first updating its tariff, and may not charge more than its tariff allows after the pass-through tax is added to the tariff.  The Court can resolve this issue on its own.  Consequently, the Court finds no reason to stay or dismiss on primary jurisdiction grounds.

## B.

Count II is similar.  Plaintiff asserts that, based on the same factual allegations as Count I, Windstream East imposed on Plaintiff an unlawful charge in violation of 47 U.S.C. § 201(b) and 47 U.S.C. § 207. The language of 47 U.S.C. § 201(b) says: "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful."[7]  The analysis under Count I applies equally to

---

[7] 47 U.S.C. § 207 addresses recovery of damages. It reads "Any person claiming to be damaged by any common carrier subject to the provisions of this Act may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this Act, in any district court of the United States of competent jurisdiction, but such person shall

Count II.  The Court concludes that this Count is also properly before the Court.

Defendants point to language in *In re Long Dist. Telecomms. Litig. v. ITT-U.S. Transmission Sys., Inc.*, where the Sixth Circuit concluded that a plaintiff's 201(b) claims were within the primary jurisdiction of the FCC. 831 F.2d 627, 631. The Court said "[s]ection 201(b) speaks in terms of reasonableness, and the very charge of Count I is that defendants engaged in unreasonable practices. This is a determination that 'Congress has placed squarely in the hands of the FCC.'" *Id.* citing *Consolidate Rail Corp. v. National Ass'n of Recycling Industries, Inc.*, 449 U.S. 609, 612 (1981). However, a closer look at this case reveals that its facts are materially different than those here. The *Long Distance* case dealt with claims related to defendants' practice of charging for uncompleted calls, ring time and holding time and failing to inform customers of this practice. 831 F.2d at 627. Determining whether that practice was reasonable under 201(b) was a novel question, unlike the one presented and already answered in Count I. It required the expertise of regulators, who could offer a uniform solution. Because the FCC has already clearly answered the claims here, the Sixth Circuit's language in *Long Distance* is not applicable.

C.

In Count III, Plaintiff asserts that, based on its Kentucky tariff, Windstream East overcharged for intrastate services in violation of KRS 278.160(2). Plaintiff alleges that the relevant PSC tariffs did not authorize Windstream East to pass along the Kentucky Surcharge to its customers. The language of the Kentucky statute is similar to that of the federal statute.[8]  The

---

not have the right to pursue both such remedies.

[8] KRS 278.160(2) states, in part:  "No utility shall charge, demand, collect, or receive from any person a greater or less compensation for any service rendered or to be rendered than that prescribed in its filed schedules... .

applicable state tariff provision is not so clear as its federal counterpart. The "Provision for Certain Local Taxes and Fees" reads:

> There shall be added to the customer's bills, as a separate item, an amount equal to the proportionate part of any license, occupation, franchise, *or other similar fee or tax now or hereafter agreed to or imposed upon the Company by local taxing authorities*, whether imposed by ordinance, franchise or otherwise, and which fee or tax is based upon a percentage of the gross receipts, net receipts, or revenues of the Company. Such amount shall be added to bills of customers receiving service within the territorial limits of the taxing authority.

P.S.C. Ky. No. 7, Original Page 27 (emphasis added).

The parties dispute the meaning of this section. Plaintiff points to the phrase "local taxing authorities" and asserts that because the charge at issue is a tax imposed by state authorities, this provision does not apply. Defendants argue that the "local taxing authorities" language includes the state, especially considering the origins of the Kentucky gross revenues tax. Defendants say KRS 136.616 was adopted at the same time as KRS 136.660, a statute that terminated the ability of political subdivisions of Kentucky to levy directly on carriers franchise fees or taxes on communications services. Now, political subdivisions, or local taxing authorities, share in the revenues KRS 136.616. Thus, Windstream argues, the local franchise fees are now collected through the state tax, and that tax is covered by the above tariff language.

To resolve this dispute, this Court would need to address two issues not present in its analysis under Counts I and II: (1) whether the PSC would rule as the FCC did in *Irvin Wallace* on the issue of tariffs and pass-through taxes and (2) whether the "local taxing authority" language of Windstream's tariff encompasses state statutes. The first question implicates a policy issue that the PSC should decide and apply uniformly to all carriers. The second question

"

is likely within the Court's discretion, as courts are permitted to construe tariffs to the extent that they raise issues of law. All things considered, however, the Court believes that these matters are best left to the PSC at this time. The first question suggests deference to the PSC. The second question is also clearly within the PSC's area of expertise. Plaintiff did offer a 2008 PSC decision in which a utility applied to amend its tariff to include a franchise fee and local tax rider. *See In the Matter of Application of LG&E for Approval of Revisions to Its Tariff Governing Recovery of Franchise Fees*, KPSC Docket No. 07-521 (Order of Jan. 31, 2008). Though this opinion may be informative as to the Court's second question, it does not resolve the critical first question about whether the PSC would require a carrier to update its tariff before charging a pass-through tax.

The Court will stay Count III to allow the PSC to address the dispute. A stay is more appropriate than a dismissal, because the Court may need to resolve damages and other issues at a later date. *See Long Distance*, 831 F.2d at 632 (noting that a district court erred in dismissing a count rather than staying it).

D.

Count IV alleges that, pursuant to 47 U.S.C. § 201(b) and 47 C.F.R. § 64.2401, Defendants's bills violated federal "Truth-in-Billing" rules by (1) describing the Kentucky Surcharge as "regulated" and listing it with government mandated taxes and fees on its bills and (2) imposing a surcharge that was higher than the Kentucky surcharge rate imposed on Windstream.

The first prong of Count IV raises questions different than those implicated in Count III, because they require the Court to interpret Defendants' bills, rather than Defendants' tariffs. As

discussed below, they also involve an area of law in which the FCC has published extensive commentary.

As noted in Count I and Count II, Section 201(b) mandates that all charges be "just and reasonable." Additionally, 47 C.F.R. § 64.2401(b) requires that "charges contained on phone bills must be accompanied by a brief, clear, non-misleading description of the service or services rendered." A 2005 FCC opinion explains in more detail what practices are misleading. *In the Matter of Truth-in-Billing and Billing Format,* Second Report and Order, 20 FCC Rcd 6448 (2005). For instance, the FCC said "it is misleading to represent discretionary line item charges in any manner that suggests such line items are taxes or charges required by the government." *Id.* at ¶ 1 (2005). The opinion went on to say:

> Consistent with the Commission's prior findings, we reiterate that it is a misleading practice for carriers to state or imply that a charge is required by the government when it is the carriers' business decision as to whether and how much of such costs they choose to recover directly from consumers through a separate line item charge. Consumers may be less likely to engage in comparative shopping among service providers if they are led to believe erroneously that certain rates or charges are unavoidable federally mandated amounts from which individual carriers may not deviate. This prohibition includes not only misleading statements or descriptions, but also placement of the charge on the bill in such a way as to lead a reasonable consumer to believe that the charge has been mandated by the government. *For example, because placing a discretionary charge in a section or subsection of the bill that otherwise contains only government required charges or taxes may mislead a reasonable consumer into believing that such charge also is required, such placement is not allowed.* We also are concerned that some carriers may be labeling certain non-regulatory line item charges in such a way as to create confusion with regulatory programs. *As a result, carries should take great caution in using terms that are most commonly associated with governmental programs to describe other charges that are unrelated to those programs.*

*Id.* at ¶ 27 (emphasis added). Plaintiff cites this language in support of her argument that Windstream's placement of the Kentucky Surcharge in the "Regulated" section of its bill is misleading, especially since before the Surcharge, Defendant listed only government mandated

fees in the "Regulated" Section of its bill. In response, Defendant points to language in the "Taxes, Surcharges and Fees" Section of its bill that explicitly states "[i]n the case of gross receipts surcharges, they are not government mandated charges." As with the other federal claims, the Court finds that the statutory language and the previous FCC opinions offer sufficient guidance to allow this Court to determine the issue. Thus, the primary jurisdiction doctrine does not requires either dismissing or staying the first prong of Count IV.

The *Truth-in-Billing* opinion also addresses the second prong, stating that "the burden rests upon the carrier to demonstrate that any line item that purports to recover a specific governmental or regulatory program fee conforms to the amount authorized by the government to be collected." *Id.* at ¶ 1 (2005).

> [W]e reiterate that it is unreasonable and misleading for carriers to include administrative and other costs as part of 'regulatory fees or universal service charges' or similar line item labels that imply government mandated charges. Although the Commission focused primarily on the universal service charge, we reiterate here that, as the language in that order indicates, this prohibition applies to all regulatory fees. It is our view that these costs are no different than other costs associated with the business of providing telecommunications service and may be recovered through rates or other line item charges. *Thus, it is an unreasonable practice for carriers to include any costs that do not accurately reflect the carrier's actual obligation to the specific governmental program that the line item purports to recover.* For example, carriers that elect to recover their universal service contribution costs through a separate line item may not mark up the line item above the relevant contribution factor established by the Commission. *As a result, a regulatory line item charge should never exceed any maximum amount or cap established by the government to recover for that specific program.*

*Id.* at ¶ 28 (emphasis added). If Plaintiff proves its allegations – that Windstream East charged its customers more than it paid the state and led those customers to believe that the charges were required – this FCC opinion is on point. Thus, the FCC has offered this Court sufficient guidance

to allow it to determine the second prong of Count IV.[9]

There are other reasons that Count IV is not appropriate for a primary jurisdiction referral. Plaintiff's claims in Count IV are based primarily on Defendants' individual bills and whether they are misleading. Thus, the questions raised are intensely fact specific and their resolution would not likely impact other carriers. Such questions may be precisely the ones that district courts should answer, to allow the relevant agencies to focus on broader issues that impact all carriers. At the very least, these issues are ones that agencies and district courts are equally equipped to hear. Upon careful consideration and for all of these reasons, the Court declines to stay or dismiss Count IV on the basis of primary jurisdiction.

## IV.

In Counts V, VI and VII, Plaintiff claims that Defendants improperly applied the Kentucky Surcharge to cable and internet services, upon which Defendant paid no taxes whatsoever. Plaintiff asserts that doing so constitutes a violation of the Kentucky Consumer Protection Act (Count V), negligent misrepresentation (Count VI) and conversion (Count VII). As with the other Counts, Defendants argue that these allegations raise issues properly addressed in the first instance by the FCC or the Kentucky PSC. Additionally, Defendants argue that if the Court determines that primary jurisdiction does not apply, Counts V, VI and VII are barred by the "Terms and Conditions" Plaintiff was subject to as a purchaser of Windstream East's services. The Court will address each argument in turn.

Unlike telecommunications services, cable and internet services are not subject to state or

---

[9] Defendants also argue, as they do in Count II, that Count IV should be dismissed or stayed pursuant to the primary jurisdiction doctrine because of language in a Sixth Circuit opinion indicating that Section 201(b) claims should be decided by the FCC. *In re Long Distance*, 831 F.2d at 631. As noted in the analysis of Count II, the Court does not read that language as a flat ban on district courts hearing any claims that arise under Section 201(b).

federal tariffs. Thus, Defendants have more freedom to set cable and internet rates. Common law or certain consumer protection statutes, rather than agency rules or decisions, govern the propriety of the rates. Nonetheless, Defendants argue that the Court should stay or dismiss these Counts so that the FCC or PSC may determine whether cable and internet services are "communications services" under Kentucky law.

This argument seems to miss the point. The question presented here is whether Windstream East is charging customers more for the Kentucky Surcharge than it is paying. This issue is likely to turn on the facts of the case, and will probably be resolved when discovery shows how much Windstream East is collecting versus how much it is paying the state of Kentucky. Though it is possible that the ultimate issue will be whether the state is collecting more than it is supposed to under KRS § 136.616, that is still not an issue that the PSC or the FCC would decide. Because these questions are not those typically decided by an agency, the Court declines to stay or dismiss them.

Finally, Defendants assert that Counts V, VI and VII must fail because Windstream East applied the Kentucky Surcharge only to items for which it has paid Kentucky's gross revenues tax, and the claims ignore the Terms and Conditions to which Plaintiff agreed when purchasing services from Windstream East. Both of these assertions involve disputed issues of fact that would make resolution impossible at this point in the litigation. To the extent that Defendants argue that, as a matter of law, Plaintiff is subject to Terms and Conditions she never agreed to, the Court disagrees. Basic contract law provides that a party to a contract must accept the contract to be bound by it. *Whitaker v. Associated Credit Services, Inc*. 946 F.2d 1222, 1226 (6th Cir. 1991).

V.

Defendants also contend that limitations periods in their tariffs bar large portions of Plaintiff's Complaint.  Windstream East's federal tariff provides a specific procedure for addressing "billing disputes." Section 2.4.1 (D) reads:

> A valid billing dispute consists of written documentation specifically listing the total dollar amount of the dispute, specific rate elements being disputed and their dollar amounts. The dispute must be received in writing within 30 days after the due date of the bill. At least one of the seven following reasons must be given for the dispute to be considered valid. 1. Incorrect Rate ...

Defendants argue that this provision, which as a tariff carries the weight of law, limits Plaintiff's damages to those sustained in the 30 days prior to filing her Complaint.  Plaintiffs respond that the federal limitations period for refunds of untariffed charges is two years, pursuant to 47 U.S.C. § 415. Thus, the Court must determine whether Plaintiff's tariff can effectively amend the statutory limitations period.  Only a few courts have addressed this issue. These opinions are neither particularly persuasive nor binding on this Court.

Defendants cite two district court opinions in support of their position. The first, *MFS International, Inc. v. International Telecom, Ltd.*, addressed a carrier's argument that contractual provision in its service agreement prevented customers from bringing claims more than a year after their claims accrued. 50 F.Supp. 517, 522-23 (E.D. Va. 1999). There, the district court found that the contractual provision barred the defendant-customer's counterclaim, despite the longer limitations period of 415(b), concluding that "there is no justification  for disallowing the relevant contractual provision simply because an explicit federal statute of limitations exists when that statute does not prohibit such shortening, either explicitly or by clear implication." *Id.* at 523.  Our case does not concern a contractual provision as directly addressed in *MFS*

18

*International*.[10]

    In the second case, *Powers Law Offices v. Cable & Wireless USA*, a district court in Massachusetts enforced a provision in the carrier's tariff that required customers to bring billing disputes to the carrier's attention within 45 days. 326 F.Supp. 2d 190, 192-93 (D. Mass. 2004). In *Powers*, a class action, the Plaintiffs alleged that the Defendant charged more than allowed under its filed tariffs. The court noted that "the tariff governs 'not only the nature and extent of [the provider's] liability, but also the nature and extent of the [customer's] right of recovery.'" *Id.* at 192, quoting *N. Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir. 1978). In finding that the tariff's 45-day-provision limited Plaintiffs' claims, the court made no mention of the federal statute setting the limitations period at two years.[11]  In short, the Court finds little helpful guidance from these cases.

    Plaintiff cites an unpublished opinion from the Eastern District of Virginia reaching the opposite conclusion.  In *MCI-Worldcom Network Services, Inc. v. Paetec Communication, Inc.*, the court addressed a tariff provision that required a plaintiff to dispute overcharges on a bill within 90 days. No. 04-1479 (E.D. Va. Mar. 16, 2005) (not reported in F. Supp.), *aff'd,* 204 Fed. Appx. 271 (4th Cir. 2006) (unpublished). The defendant argued that the 90-day-notice period in the tariff, and not the federal statute, applied to Plaintiff's challenge that certain charges it paid

---

[10] A footnote in the *MFS International* opinion does suggest that even if there had been no 30-day provision in the contract, a similar provision in the company's tariff would serve to shorten the limitations period. 50 F.Supp. 2d at 523 n. 14.  The court makes no effort to distinguish or explain any differences between a direct contractual provision and a tariff provision.

[11] After the hearing, Defendants supplied additional cases in which various courts noted that "tariffs conclusively and exclusively control the rights *and liabilities* of the parties." This Court does not dispute that assertion. However, the present case involves a conflict not directly faced in those cases, because the tariff here potentially conflicts with a federal statute.

were unsupported by defendant's tariff. *Id.* at 1. The court acknowledged that parties can contract to shorten a statute of limitations, but noted that "[t]he terms of a tariff, however, are set unilaterally by the service provider and not negotiated like a contract. If this Court were to find that the tariff takes priority over a federal statute, it would allow service providers to unilaterally void federally codified consumer protections simply by filing a tariff." *Id.*, citing *Telco Communications Group, Inc. v. Race Rock of Orlando, LLC*, 57 Supp. 2d. 340, 345 (E.D. Va. 1999) (rejecting the argument that a filed tariff can supercede Regulation Z, the federal regulation that implements the Truth in Lending Act, because a tariff cannot change a "statutorily imposed liability cap" and that to hold otherwise would allow utility companies "to contract around important consumer protections simply by filing tariffs"). The court ultimately found that federal statute of limitations, rather than the tariff, governed Plaintiff's claim. *Id.* The Fourth Circuit affirmed that ruling without discussion based on the reasoning of the district court. 204 Fed. Appx. at 272. While these cases do not bind this Court, at least they properly address the issues in play.

This Court has similar concerns about the unilateral imposition of a 30-day limitations period upon consumers, particularly in these circumstances. This is not a garden-variety billing dispute. Rather, Plaintiff claims she was overcharged based on a rate she knew nothing about and could not determine from the face of her bill. Additionally, one of Plaintiff's core complaints is that Defendants took affirmative steps to mislead her by representing that the charges on her bill were authorized or required government fees. If these allegations are true, it would be unfair

to require Plaintiff to discover the overcharge and contest it, all within a single billing cycle.[12]

This Court believes that unilaterally imposing a short limitations period in a tariff is materially different than mutually agreeing to a shorter period by contract. To the extent that *MFS International* or *Powers* come to a different conclusion, the Court disagrees with their reasoning. The federal tariff operates as a statute in the absence of contrary or conflicting federal statutes. As a general rule, however, a unilateral tariff should not operate to void a federal statute which is directly opposed to the tariff.

This Court concludes that Congress did not intend to establish a two-year statute of limitations which could be overridden by a unilaterally approved tariff. Though the tariff has the force of statute in the absence of congressionally mandated rates, its force cannot possibly be so absolute in the face of an existing and conflicting statute. The Court concludes that the two year limitations period provided for in 47 U.S.C. § 415 will govern Plaintiff's claims in this case.

The Court will issue an order consistent with this Memorandum Opinion.

---

[12] Though the FCC has not officially ruled on this issue in the context of end users, it has discouraged use of short limitations periods in tariffs based upon similar considerations. *In the Matter of AT&T Co. to Petition To Rectify Terms and Conditions of 1985 Annual Access Tariffs*, 3 FCC Rcd 5071, n. 50 (1988). It said:

> In addition to denying customers equal treatment, tariff provisions that place short time limits on the claims process may be inconsistent with Congressional intent embodied in Section 415(c) of the Communications Act, 47 U.S.C. § 415(c), which provides a two-year statute of limitations for actions at law to recover overcharges. The Section 415(c) limitation on legal actions for damages does not directly control tariffed limitations on the right of access customers to avail themselves of informal dispute resolution procedures provided by the LECs. Nevertheless, we believe the two-year limitations period specified in the Act evinces a Congressional belief that customers should have a reasonable period in which to seek relief from overcharges, and, to that extent, is generally instructive regarding the reasonableness of the dispute resolution procedures provided in tariffs.

*Id.*

cc:     Counsel of Record