UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

Dana Bowers and Sunrise Children's Services,
Inc., on Behalf of Themselves and
Others Similarly Situated,

        PLAINTIFFS

v.

Windstream Kentucky East, LLC

and

Windstream Kentucky West, LLC,

        DEFENDANTS.

CIVIL ACTION NO. 3:09-CV-440

**ELECTRONICALLY FILED**

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Defendants Windstream Kentucky East, LLC ("Windstream East") and Windstream

Kentucky West, LLC ("Windstream West") (sometimes referred to together as "Windstream"),

by counsel, submit this memorandum in response to Plaintiffs' motion for class certification.[1]

## I. INTRODUCTION

Plaintiffs' motion is scarcely more than a recitation of the Rule 23 requirements paired

with conclusory statements that those requirements are satisfied here. Plaintiffs have not met

their burden of *proving* that class certification is appropriate. Plaintiffs should not be permitted

to file an unsupported motion for class certification that is devoid of *any* record evidence and

then sit back and expect that Windstream be required to disprove their position. This approach is

an improper effort to shift the burden of proof regarding class certification to Windstream, and

---

[1] References to "Windstream" should not be construed to imply that Windstream East and Windstream West are not
separate entities, but merely as a convenient means of describing matters that apply equally to both entities.

Plaintiffs' motion should be denied for this reason alone.[2]

However, Plaintiffs' arguments are flawed in multiple respects, as Windstream will establish, and class certification should be denied for these substantive reasons as well. First, Plaintiffs seek to certify a class that includes every customer of Windstream billed a gross receipts surcharge ("GRS") at any point from June 22, 2007 to the present, based on the premise that the GRS allegedly is not permitted by Windstream's tariffs. However, Windstream provides a variety of services to a wide range of different types of customers subject to varying bases for each customer relationship. Many of these relationships do not involve tariffs, or involve combinations of tariffs and other terms. Many customers, such as Windstream's wholesale carrier customers (as opposed to retail customers like Plaintiffs) purchase services pursuant to individually negotiated contracts, not tariffs, as do many retail business customers.[3] Other customers, including retail customers like Plaintiffs, purchase services pursuant to Windstream's general terms and conditions of service, as opposed to or in combination with the tariffs. Customers who receive services pursuant to individually negotiated contracts or Windstream's general terms and conditions are billed the GRS, but they cannot be included in a class seeking to resolve claims premised on alleged tariff violations. Indeed, Windstream's individually negotiated contracts and general terms and conditions contain clear and conspicuous language that customers are responsible for all applicable taxes, fees, and surcharges, which include surcharges such as the GRS.

Second, Plaintiffs' claims present individualized questions that preclude class treatment. For instance, several claims require proof of reliance, which is an inherently individualized

---

[2] At the January 12, 2011 status conference, Windstream's counsel expressed their concern that Plaintiffs' representation that they needed no discovery to file their motion for class certification would prove problematic if Plaintiffs attempted to backload support for their arguments into their reply. Should they do so, as stated at the conference, Windstream should be permitted a sur-reply at a minimum.

[3] Plaintiffs do not allege any claim for breach of contract.

question. Moreover, the fact that Plaintiffs filed this action two full years after Windstream began assessing the GRS raises individualized affirmative defenses, such as the voluntary payment doctrine and failure to mitigate damages. Further, individualized questions of what (and when) individual customers knew, should have known, or were told about the GRS, permeate Plaintiffs' claims premised on the theory that Windstream allegedly mischaracterized the GRS to customers. Such individualized questions would form the centerpiece of this litigation, defeating the purposes of class certification.

Finally, Plaintiffs cannot adequately represent the proposed class. Plaintiffs cannot represent Windstream customers that receive services pursuant to a range of different bases, as noted above, because they do not share the same interests and are not similarly situated to those customers. Contradictions in Mrs. Bowers' sworn testimony and her counsel's representations as to the timing of her recruitment for this action raise additional questions of adequacy.

## II. FACTUAL, PROCEDURAL, AND REGULATORY BACKGROUND

### A. The Parties and Their Services.

#### 1. Windstream East and Windstream West.

Windstream East and Windstream West provide a wide range of communications, high-speed internet, and digital video services in Kentucky. (*See* Affidavit of Michael D. Rhoda, attached as Ex. A, ¶ 2.) Windstream provides these various services to retail customers (both residential and business), such as Plaintiffs, and to wholesale customers (*e.g.*, other carriers purchasing access to Windstream facilities to provide services to their customers). (*See id.*) Depending on the type of service and combination of services and the type of customer, Windstream may provide services pursuant to a variety of different arrangements including, in whole or in part, tariffs or price lists filed with the Federal Communications Commission ("FCC"), tariffs or price lists filed with the Kentucky Public Service Commission ("PSC"),

individually negotiated contracts, negotiated and/or arbitrated interconnection agreements filed with the PSC, commercial wholesale agreements and arrangements, Windstream's general terms and conditions of service, and/or other arrangements. (*See id.* ¶ 3.)

### 2. *Dana Bowers.*

Dana Bowers is a residential retail customer of Windstream East. (*See* Affidavit of Cesar Caballero, attached as Ex. B, ¶ 2.) Mrs. Bowers purchases Windstream East's "Feature Pack A" telephone service, DSL Ultra broadband service, and DSL Protection Plus wire maintenance plan. (*Id.*) Mrs. Bowers has purchased only these services throughout the relevant time period (June 22, 2007 to the present). (*See id.*) Mrs. Bowers' Feature Pack A service, a packaged service provided to few customers, is referenced in Windstream East's General Customer Services Tariff, P.S.C. KY No. 7 ("PSC KY No. 7"), consistent with KRS 278.544. Telephone utilities are required to identify the availability of certain packaged services in tariffs filed with the PSC, but such packages are deregulated and subject to the utility's terms and conditions of service. *See* KRS 278.544. Mrs. Bowers' DSL and Protection Plus Plan services are non-tariffed services also subject to Windstream East's general terms and conditions of service. (Ex. B ¶ 6.) Windstream's terms and conditions expressly provide that a customer is "responsible for paying any taxes, *surcharges*, fees and assessments *imposed by [Windstream]* or a governmental authority from time to time in connection with the Services or Equipment." (Ex. A.4–5 (emphasis added).) With respect to Windstream's federal tariffs, Mrs. Bowers is assessed a federally-established Subscriber Line Charge ("SLC") that is reflected in the federal tariffs but is expressly governed by Windstream's local billing arrangements. (*See* Ex. B ¶ 3.) As discussed in greater detail herein, the SLC is described as an End User Access Service, but it is not an interstate service such as a circuit, and instead is an FCC-established charge assessed as an incident to Mrs. Bowers' local, intrastate telephone service. (Ex. A ¶ 18.)

### 3. Sunrise Children's Services.

Sunrise Children's Services, Inc. ("Sunrise") is a retail business customer of Windstream East and Windstream West but is only a named Plaintiff against Windstream West. Sunrise receives different services at its different locations. (Ex. A ¶ 17.) All of Sunrise's local services are deregulated and/or de-tariffed and subject to Windstream's terms and conditions, which expressly provide that the customer is responsive for all surcharges assessed in connection with the services. (*Id.* ¶ 17.) Sunrise purchases no interstate services such as a circuit. (*Id.* ¶¶ 17–18.) Sunrise also is assessed the SLC.[4],[5] (*Id.* ¶ 18.)

### 4. Plaintiffs' Invoices.

Windstream's general terms and conditions of service and its tariffs are posted on its website, and each of Mrs. Bowers' and Sunrise's monthly invoices provide that explanations of rates, charges, and how to verify the accuracy of a bill may be obtained by calling the toll-free number provided or through a Windstream retail location. (*E.g.*, Ex. A.8; Ex. B.1.) The instructions received by Plaintiffs on a monthly basis also advise of the need to report any discrepancies within 20 days to assure prompt attention to the issue. (*Id.*) Further, each monthly invoice references Windstream's website. (*E.g.*, *id.*) In June 2010, the invoices added language expressly reminding customers: "Use of the Services constitutes your agreement to Windstream's Terms and Conditions maintained at www.windstream.com/terms, or you may request a copy by calling 866-445-3402." (Ex. A.12.) The invoices also inform customers that changes to the terms and conditions would appear in the "Windstream Customer Message"

---

[4] As discussed below, End User Access Services are subject to Windstream's terms and conditions of service with respect to Plaintiffs' services. However, Plaintiffs seek to represent other customers such as wholesale carrier customers that purchase interstate services out of Windstream's federal tariffs such as access services, which are subject to the general terms and conditions set forth in the tariffs, including the billing dispute provisions contained in the tariffs.

[5] Sunrise is also assessed a ISDN PRI Port charge that is a considered an End-User Access Service. However, this charge is not assessed the GRS and will not be further discussed.

section of future bills, and that the terms of any contract would govern for business customers with existing contracts. (*Id.*) Mrs. Bowers, who is a long-time customer, received similar notices as far back as 2002 advising her of the website and that any future changes to her charges would be stated in bill messages. (*See id.;* Ex. A.13.)

**B.**    **Windstream Provides Different Services To Different Types of Customers That are Subject To Different Terms and Conditions.**

In the broadest of terms, Windstream provides services to two basic types of customers: retail and wholesale. (*See* Ex. A ¶ 2.) Plaintiffs are retail customers, as they purchase Windstream services for their own use and not for provision of services to third parties. (*See id.*) As discussed below, Plaintiffs are not similarly situated to wholesale carrier customers, nor are they similarly situated to other retail customers, as there are a range of different terms and conditions that govern different retail customers' services.

**1.**    ***Wholesale Carrier Customers Receive Services Pursuant To Tariffs And Contracts.***

Windstream's wholesale carrier customers are other communications providers that obtain services from Windstream for purposes of serving their own customers.[6] (Ex. A ¶ 4.) Examples of Windstream's wholesale carrier customers would include interexchange carriers (*i.e.*, long distance carriers), commercial mobile radio service providers (*i.e.*, wireless carriers), and competitive local exchange carriers (*i.e.*, other competitive landline carriers, which can include cable providers who offer telephony services). (*Id.*) Additionally, although not wholesale customers, there are some large enterprise retail customers that may purchase some of the same types of network services as wholesale providers, but do so on a large scale and for unique purposes (*e.g.*, a bank connecting all ATMs to a central location or a hospital connecting

---

[6] Some of these wholesale carrier customers assess a gross receipts surcharge on their own customers placing them squarely at odds with Plaintiffs' attempts to include them in a class and further differentiating them from retail customers like Plaintiffs. (*Id.* ¶ 6.)

multiple facilities). (*Id.*)

Generally speaking, wholesale customers access Windstream's network to serve their own customers and to connect pieces of their own networks. (*Id.* ¶ 5.) Large enterprise retail customers may purchase special access services for similar connectivity purposes. (*Id.* ¶ 4.) With the exception of long distance carriers, wholesale carrier customers generally obtain services from Windstream pursuant to individually negotiated contracts such as interconnection agreements or other commercial arrangements, and not solely pursuant to Windstream's tariffs. (*Id.* ¶ 6.) This is the case for the majority of wireless, CLEC, and large retail enterprise customers. (*Id.*) Although these contracts are individually negotiated, and sometimes arbitrated, they routinely include a provision by which the customer agrees to pay any surcharges or fees assessed by Windstream on the services provided, which includes the GRS. (*Id.* ¶ 6.) While the tariffs may supplement (and even govern, in the event of a conflict) the terms and conditions applicable to the wholesale access services, that does not absolve the customer of its responsibility under the contract for applicable fees and surcharges. (*Id.*)

Long distance carriers typically purchase access services pursuant to Windstream's tariffs. (*Id.* ¶ 7.) These customers frequently have entire departments, consultants, or billing teams/personnel devoted to reviewing, validating, and disputing bills from other carriers and evaluating them against the relevant tariffs. (*Id.* ¶¶ 7, 9.) Indeed, long distance carriers commonly are active not only in reviewing monthly invoices and tariffs, but sometimes in opposing or challenging tariffs. (*Id.*) Notably, although Windstream, in an abundance of caution, amended its federal tariffs to add the GRS effective August 7, 2008, no customer challenged Windstream's tariff filing with the FCC. (*Id.* ¶ 9.)

Additionally, wholesale carrier customers frequently engage in dispute settlement

processes with Windstream. (*Id.* ¶ 10.) This is a practice common in the telecommunications industry (and should not be viewed as an indictment of any carrier's services, and Windstream itself initiates similar processes with other carriers). (*Id.*) To provide an example of the typical volume of such disputes, Windstream has a wholesale billing department that as of April 2011 was tracking thousands of wholesale carrier customer complaints. (*Id.*) Many such disputes may be invalid or untimely, and some may result in individual settlement agreements or routine dispute resolution reports. (*Id.* ¶ 11.) It is also common industry practice to include what is called a "stakedate" in settlement agreements. (*Id.*) The effect of the "stakedate" is to eliminate all claims of any nature prior to a certain point in time, which in this case may include any claims with respect to the GRS. (*Id.*)

### 2. Retail Customer Receive Services Pursuant To Tariffs, Contracts, Windstream's Terms Of Conditions And Service, And Other Arrangements.

The second general category of Windstream customers consists of retail customers—*i.e.*, customers purchasing services from Windstream for their own use. (Ex. A ¶ 12.) There are two basic types of retail customers: business and residential. (*Id.*) Within these broad categories, there are also key distinctions, including whether the retail customers purchase tariffed or de-tariffed services, operate pursuant to individually negotiated sales contracts, or operate pursuant to terms and conditions. (*See id.*) Approximately 85% of Windstream's revenues from business retail customers are from customers having individually negotiated contracts for services. (*See* Windstream East Resp. to Int. Nos. 13–15, attached as Ex. C; Windstream West Resp. to Int. Nos., 14–16, attached as Ex. D.) These business contracts include language whereby the customer acknowledges that it is responsible for all applicable fees and surcharges assessed by Windstream, which includes the GRS. (Ex. A.2–3.) Much like Windstream's wholesale customers, these contracting business retail customers regularly scrutinize their monthly

invoices. (Ex. A ¶ 14.) Due to the nature of their services, many are assigned Windstream account representatives as a single point of contact regarding service and billing questions, and many have consultants or dedicated internal contacts whose responsibility it is to compare prices, review bills, investigate service quality metrics, etc. (*Id.* ¶ 14.) Indeed, given the highly competitive nature of the modern telecommunication industry and the availability of many types of services from many types of carriers (*e.g.*, landline carriers and wireless carriers), many different types of customers from wholesale carriers to retail residential customers scrutinize their bills, shop for the best available deal, and do not hesitate to question new charges that appear on their bills. (*See id.* ¶¶ 14, 19.) The facts and legal analysis specific to each customer scenario would present a variety of challenges and defenses to the general claims being raised by Plaintiffs.

Business customers and residential customers purchase services subject to different arrangements other than individually negotiated contracts. Some retail customers who subscribe only to regulated basic local exchange service (which include neither Bowers nor Sunrise) may currently purchase service pursuant to Windstream's local tariffs. (Ex. A ¶ 15.) Others purchase de-tariffed and/or deregulated services pursuant, in whole or in part, to Windstream's general terms and conditions of service or other arrangements. (*Id.* ¶ 16.) As with Windstream's individually negotiated contracts, its general terms and conditions of service provide that the customer is responsible for all applicable surcharges or fees assessed by Windstream. (Ex. A.4–5.) All of these customers are subject to month-to-month service terms. (*Id.*) Determining factually and legally which terms govern each customer's service is a critical question in evaluating any claims and defenses asserted in this action and further demonstrates that a class cannot be certified.

### 3. Plaintiffs' Federally Tariffed "Services" Are Unlike Tariffed Services Purchased By Other Customers.

Neither Plaintiff purchases any switched or special access services subject to the general terms and conditions of Windstream's FCC tariffs. (Ex. A ¶ 17.) Instead, each Plaintiff is assessed the federal SLC. (*Id.* ¶ 17–18.) The federal SLC charge is an "End User Access Service" described in Section 4 of the federal tariffs. (*Id.* ¶ 18.) These charges are established by the FCC and are charges incidental to Plaintiffs' subscribing to local services (*i.e.*, services not only within a state but within a local telephone exchange area). (*See id.*) The local nature of these "services" is emphasized in the federal tariffs themselves, which state that Windstream will provide End User Access Service "to end users who obtain local exchange service from the Telephone Company under its general and/or local exchange tariffs" and state that Windstream "will be responsible for contacts and arrangements with customers for the billing of End User Access charges." (Ex. A.6.) These End User Access Services thus are unique charges established by law, and they are wholly dissimilar to actual *interstate access services* that Windstream's wholesale carrier and enterprise customers purchase under the relevant sections of the applicable tariffs and/or negotiated contracts.

### C. The Gross Receipts Surcharge.

On January 1, 2006, Kentucky eliminated franchise fees imposed directly on certain providers by individual municipalities and began imposing a 1.3% tax on the gross revenues received by providers of communications services. KRS 136.616(2)(b). The statute unconstitutionally barred providers from collecting the tax directly from their customers or separately stating the tax on bills to their customers, but the provision did not prevent communications service providers from passing the costs of the tax through to their customers. *See BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 500 (6th Cir. 2008). The

statutory prohibition on separately stating the tax in the form of a line item surcharge in bills to customers was held to be unconstitutional. *Id.* at 500–01. Therefore, a carrier is allowed to recover its cost of the tax from its customers through a line item surcharge and should have been allowed to do so from the time the tax was initially imposed.

Because KRS 136.616(3) initially included the unconstitutional prohibition on a line item surcharge to recover the costs of the gross revenues tax, Windstream did not initially implement a line item surcharge on the bills to its customers. (Ex. A ¶ 21.) When the district court in *BellSouth* struck down the unconstitutional provisions of KRS 136.616(3), Windstream implemented the GRS to recover its costs of the tax. (*Id.*) Windstream assessed the GRS to services for which revenues would be considered part of Windstream's gross revenues subject to the tax, as detailed in guidelines from the Kentucky Department of Revenue. (*Id.* ¶ 22.) For example, revenues from inside wire maintenance plans (such as the Protection Plus Plan) are subject to the gross revenues tax, and Windstream assesses the GRS to those items. (*Id.*)

Windstream has sought to recover through the GRS *only* its costs of the gross revenues tax, and, in fact, has recovered less through the GRS than it has paid in gross revenues tax. (*Id.* ¶¶ 21–23.) Windstream has assessed the GRS in varying percentages to account for its efforts to tie the GRS assessments to recovery of its costs of the gross revenues tax. (*Id.* ¶ 23.) Importantly, nothing in *Bell South* requires a surcharge used to recover the costs of the gross revenues tax to mirror the tax, but, rather, the court permitted carriers to recover their *costs* of the tax. Therefore, fluctuations in the percentage of the GRS over time result from the fact that Windstream's recovery of its *costs* of the tax will necessarily vary for a variety of reasons. (*See id.*)

The GRS first appeared in Mrs. Bowers' June 22, 2007 billing statement and in Sunrise's

June 28, 2007 billing statements. (*See* Ex. A ¶ 24; Ex. B.1.) The bills included a "Windstream Customer Message" stating: "Effective with this billing statement, the Kentucky Gross Receipts Surcharge will begin appearing on your bill. This surcharge recovers a tax imposed by the State of Kentucky on all communications and entertainment providers." (*Id.*) The message also instructed customers to call customer service if they had any questions about the surcharge. (*Id.*) Additionally, these billing statements (and every subsequent billing statement) include an entry ("Taxes, Surcharges and Fees") in the truth-in-billing section for an item described as "Gross Receipts Tax/Surcharge." (*Id.*) The entry explains: "This surcharge recovers for a tax that is imposed either on Windstream or on customers directly by various states for the provision of communications services. In the case of gross receipts surcharges, they are not government mandated charges." (*Id.*) Also included on the monthly invoices and subsequent monthly invoices were instructions that explanations of the "various charges, rate schedules, and instructions on how to verify the accuracy of this bill can be obtained at a local Windstream retail location or by calling Windstream Customer Service toll-free at the number on the front page of this bill…" and further that "[b]illing or service questions or complaints should be referred to Windstream Customer Services," and finally that "[d]iscrepancies should be reported within 20 days of the date of the bill to allow necessary adjustments to be made before the next bill cycle." (*Id.*) The instructions also stated that if a portion of the bill was incorrect or disputed, that amount may be deducted from the payment and that all other charges were to be paid. (*Id.*) Unlike some other customers, neither Sunrise nor Bowers followed these instructions. Neither filed a dispute nor deducted the GRS from their payment. (*See* Bowers Depo., excerpts of which are attached as Ex. E, at 25–26, 35; Sunrise Depo., excerpts of which are attached as Ex. F, at 36–37.) Instead, Plaintiffs paid and continued paying their undisputed

invoices in full.  (*See id.*)

**D.    Different Customers Reacted Differently To the GRS.**

As Plaintiffs' counsel are well aware, various types of customers contacted Windstream with questions about the GRS, and some entered into dispute discussions and settlement of GRS questions.  At least two Windstream East residential customers used informal complaint procedures, including those through the PSC, to question the GRS.  (Ex. A ¶ 25.)  Some of Windstream's retail business customers and wholesale carrier customers contacted Windstream directly with questions about the GRS.  (*Id.*)  Some of these customers accepted Windstream's answers (much like the residential customers who contacted the PSC).  (*Id.*)  Windstream entered into confidential settlements and similar agreements with other entities regarding the GRS.  (*Id.*)

In contrast, neither Mrs. Bowers nor Sunrise ever contacted Windstream to ask about the GRS when it appeared on their bills or thereafter when it appeared in every subsequent monthly invoice.  Instead, each of them reviewed and paid their respective bills each month, in full and without complaint or other contact about the GRS, for the next two-plus years until they were recruited as long-term clients of their counsel's firm to serve as named Plaintiffs in this litigation. (Ex. E, at 26–27, 31, 35; Ex. F, at 36–37.)

Mrs. Bowers testified that she did not notice the GRS until she was contacted by Plaintiffs' counsel, who informed her of a potential issue with her Windstream bills.  (*See* Ex. E., at 25–26, 31.)  Mrs. Bowers claims that she then saw the charge in her next bill.  (*See id.* at 44.)  Mrs. Bowers testified that this occurred in July or August 2009.  (*See id.*)  After a break in the deposition, in response to questions by her counsel, Mrs. Bowers explained that she must have discussed the matter with counsel prior to July or August 2009 because the complaint was filed in June 2009.  (*See id.* at 48.)  Mrs. Bowers explained, however, that she provided all of the bills that she kept to her counsel.  (*See id.* at 49–50.)  When Mrs. Bowers finally produced copies of

her billing statements, the first bill contained in the produced documents was for August 2009—consistent with Mrs. Bowers' original testimony. Indeed, Mrs. Bowers produced *every* billing statement from August 2009 through the date of her deposition.[7]

Sunrise, like Mrs. Bowers, did not take issue with the GRS when it appeared. (*See* Ex. F, at 36–37.) This is particularly noteworthy because copies of bills produced by Sunrise contain numerous handwritten notes and markings, making clear that someone at Sunrise reviewed Windstream's bills when Sunrise received them. (*See, e.g., id.* at 49–57.) Nevertheless, Sunrise apparently entertained no dispute of the GRS until recruited by counsel to serve as a named Plaintiff against Windstream West.

## III.    PLAINTIFF'S ALLEGATIONS.

Mrs. Bowers filed this putative class action lawsuit on June 22, 2009. Plaintiffs later filed an amended complaint that adds Sunrise as a Plaintiff and drops Windstream Communications, Inc. as a Defendant, but did not change the substantive allegations. The complaint asserts seven causes of action relating to the GRS. Counts I–III allege that Windstream unlawfully assessed the GRS in violation of its federal and state tariffs. (*See* Am. Compl. ¶¶ 43–72.) Counts IV–VII allege violations of federal Truth-In-Billing laws (Count IV), the Kentucky Consumer Protection Act (KCPA) (Count V), negligent misrepresentation (Count VI), and conversion (Count VII), all arising out of the core allegation that Windstream misrepresented the GRS to customers when it described the GRS as recovering the costs of a tax, but allegedly assessed the GRS to services not subject to the gross revenues tax. (*See id.* at ¶¶

---

[7] Plaintiffs initially refused to produce any copies of their bills, despite their responsiveness to Windstream's discovery requests. After Mrs. Bowers' deposition, Plaintiffs relented and produced the bills. Plaintiffs' counsel then asserted that they discussed the GRS with Mrs. Bowers in February 2009—months earlier than the time frame testified to by Mrs. Bowers. (*See* 4/4/11 Lt. from D. Brent to M. Farris, attached as Ex. G.) Plaintiffs were unable to produce the bill that they supposedly discussed with Mrs. Bowers in February. Despite the fact that Mrs. Bowers testified that she kept most bills after being informed of the GRS, she did not produce a single bill from February 2009 through July 2009.

73–108.)

## IV.    ARGUMENT

Plaintiffs bear the burden of proving all of the required elements of Rule 23 and establishing that class certification would be proper. *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2007). The class certification decision can be dispositive, in practical effect, as improper certification may coerce the settlement of even non-meritorious claims. *See In re: Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008). Accordingly, "[c]areful application" of Rule 23's requirements is critical. *Id.*

A district court must conduct a "rigorous analysis" in deciding whether to certify a class. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982). The Court should thoroughly examine all factual and legal allegations and consider how a trial on the substantive claims could proceed on a class-wide basis. *Hydrogen Peroxide*, 552 F.3d at 317–18. The Court should "make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." *Id.* at 307. Although the Court should not purport to resolve the merits of any claim, the Court "may not decline to resolve a genuine legal or factual dispute because of concern for an overlap with the merits." *Id.* at 324; *see also In re: Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). Instead, "[g]enuine disputes with respect to the Rule 23 requirements must be resolved, after considering all relevant evidence submitted by the parties." *Hydrogen Peroxide*, 552 F.3d at 324.

### A.    No Class Should Be Certified With Respect to Count III.

While it is unclear whether they intend to do so, Plaintiffs cannot seek to certify a class to resolve Count III of the amended complaint, which asserts claims for alleged violations of KRS 278.160(2). The Court granted Windstream's motion to stay Count III and referred the matter to the PSC. The PSC has not yet reached a conclusion on any aspect of the issues before it.

Without knowing the outcome of the PSC proceeding, there is no way to properly and completely evaluate whether class certification to address Count III would be appropriate. The Court stayed Count III specifically to allow the PSC to consider the issues presented in that claim. It would be inappropriate to circumvent that stay now, while the matter is on review with the PSC, by prematurely determining whether or not a class should be certified to address Count III. *See Gentry v. Cellco P'ship*, 2006 U.S. Dist. LEXIS 97876, at *28–30 (C.D. Cal. Mar. 22, 2006) (refusing to consider class certification while the case was stayed to allow a related FCC proceeding to conclude). Indeed, the outcome of the PSC proceedings will have a material effect on any class certification analysis, as the PSC necessarily will evaluate the differences among Windstream's customers and the varying types of services purchased by those customers in considering the permissibility of the GRS.

The Court recognized in staying Count III that there may be damages or other issues to address in this action once the PSC resolves the questions before it. However, it is just as likely that there will be no issues left for the Court to resolve after PSC review. Thus, deciding whether to certify a class to resolve Count III is an issue appropriately left for resolution following the PSC proceeding, if necessary. *See id. See also Schall v. Joyce*, 885 F.2d 101, 114 (3d Cir. 1989) (affirming stay of litigation pending resolution of related state court proceedings, noting that class certification was a matter that might need to be resolved after the state court proceedings concluded).

### B.       Plaintiffs Have Made No Effort To Satisfy Their Burden To Prove That Class Certification Would Be Proper.

Actual, not presumed, compliance with Rule 23 is essential. *See Falcon*, 457 U.S. at 160. Plaintiffs must prove the propriety of class certification by a preponderance of the *evidence*, *i.e.*, they must establish that it is more likely than not, from the facts established, that the

requirements of Rule 23 are satisfied. *See Hydrogen Peroxide*, 552 F.3d at 320; *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).

Plaintiffs' essential argument is this: (1) Windstream billed the GRS in violation of its federal and state tariffs; (2) Windstream applied the GRS to services not subject to the gross revenues tax and described it in a misleading manner; (3) therefore, a class of all customers billed the GRS should be certified. Plaintiffs offer neither argument nor evidence to assist the Court in determining whether and how their claims could be tried class-wide. *See Hydrogen Peroxide*, 552 F.3d at 317–18. Tellingly, they do not even bother to identify their causes of action. It is not incumbent upon Windstream to prove that class certification is improper. But that is exactly what Plaintiffs seek in offering only a bare bones recitation of Rule 23's requirements in support of their motion. Denial of the motion is warranted for this reason alone.

## C.     The Hallmark Features of a Class Action are Absent Here.

"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Falcon*, 457 U.S. at 155. "Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001); *Hydrogen Peroxide*, 552 F.3d at 311. In other words, the claims at issue must be such that the named plaintiff can stand in the place of all members of the class. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998). As explained by one court: "The class action device envisions that liability can be determined in a single trial, and it anticipates that members of the class are entitled either to identical relief or to relief so similar that little more than a calculator or formula is required to

reach the result." *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 660 (N.D. Ga. 2001) (citing *Falcon*, 457 U.S. at 155). This observation reveals the impossibility of certifying a class here, as the facts establish that members of the proposed class are not even governed by the same billing arrangements, much less would they be entitled to identical relief.

Certifying a class only in the limited circumstances permitted by Rule 23 is critical to avoid violations of the Constitution or the Rules Enabling Act. Damages classes implicate due process concerns for class members whose rights are being litigated in their absence and potentially without their knowledge. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985). Further, a defendant has a constitutional right to present all available defenses. *Lindsey v. Normet*, 405 U.S. 56, 66 (1972). These rights would be swept aside through a haphazard application of Rule 23. Certification of a class in which the substantive rights of the defendant or the absent class members are "abridge[d], enlarge[d] or modif[ied]" also would violate the Rules Enabling Act. 28 U.S.C. § 2072(b). These concerns are evident, for example when considering the multitude of defenses Windstream would have to claims by different customers depending on the type of billing arrangement(s), what notices were provided to that customer, the customer's treatment history in addressing the GRS through settlement or otherwise, the types of services purchased by the customer, and the regulatory treatment of each service.

> **1.**   ***Proof of Plaintiffs' Prima Facie Claims is Individualized and Cannot Apply Class-Wide.***

Here, the essential characteristics of a class action are absent, as may be seen in reviewing Plaintiffs' claims. Plaintiffs' claims may be divided into two general categories: (1) claims arising from alleged tariff violations (Counts I–III); and (2) claims arising from the manner in which Windstream assessed or described the GRS (Counts IV–VII). Resolving any of Mrs. Bowers' or Sunrise's claims under either category will not, and cannot, resolve the claims

of other Windstream customers in the proposed class. Indeed, as established, neither Bowers nor Sunrise even operates pursuant to or subscribes to regulated services governed by the tariffs on which they base their claims given the local nature of the federal End User Access Services.

First, with respect to the tariff-based claims, not all Windstream customers who are billed the GRS receive regulated services pursuant to any Windstream tariff. The majority of Windstream East and Windstream West retail customers subscribe to deregulated and/or detariffed services outside the scope of the tariffs either in whole or in part. (*See* Exs. C, D.) Some customers have individually negotiated contractual relationships with Windstream that take them out of the tariffs altogether. (Ex. A ¶¶ 6, 13.) Others receive services pursuant to Windstream's general terms and conditions rather than any tariff provisions. (*Id.* ¶ 16.) If a customer did not purchase regulated, tariffed services, that customer cannot possibly be a member of the proposed class against Windstream. *See O'Neill v. Gourmet Sys. of Minn., Inc.*, 219 F.R.D. 445, 451 (W.D. Wis. 2002) (rejecting class definition that included persons who had not suffered and were not at risk of suffering same injury alleged by plaintiff); *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 680 (S.D. Fla. 2008) (rejecting overly-broad class that included persons who could not have been injured).

Additionally, some customers who were billed the GRS raised the issue with Windstream and reached a resolution of the dispute, including residential customers. (*See* Ex. A ¶ 25.) Some wholesale customers may have entered into "stakedate" or other settlements that would resolve claims involving the GRS. (*Id.* ¶ 11.) Customers who have settled or otherwise resolved any claims relating to the GRS cannot be included in any class addressing the GRS. *See Cole v. Asurion Corp.*, 267 F.R.D. 322, 332 (C.D. Cal. 2010). In sum, the class that Plaintiffs seek to certify to resolve alleged tariff claims is improper and overly broad, as it would include a host of

Windstream customers who cannot possibly have a claim against Windstream under Plaintiffs' theories even assuming that those theories applied to Plaintiffs themselves.

Second, Plaintiffs' effort to certify a class for claims relating to the assessment and description of the GRS is flawed because these causes of action contain inherently individualized elements that cannot be established through representative proof. For example, Plaintiffs allege that Windstream negligently misrepresented the nature of the GRS because it allegedly applied the GRS to services not subject to the gross revenues tax that Windstream East described the GRS as recovering.[8] An essential element of Plaintiffs' negligent misrepresentation claim is reliance. *See Presnell Constr. Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d 575, 580-82 (Ky. 2004). Plaintiffs concede as much. (Am. Compl. ¶ 103.) Plaintiffs' KCPA claim likewise necessitates a showing of reliance, as Plaintiffs once more claim, in error, that Windstream misled its customers about the GRS because Windstream assessed the GRS to services allegedly not subject to the gross revenues tax. (*See* Am. Compl. ¶¶ 94–95.)

"[C]ertification generally is inappropriate when individual reliance is an issue." *Rothwell v. Chubb Life Ins. Co. of Am.*, 191 F.R.D. 25, 31 (D.N.H. 1998). *See also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513–15 (7th Cir. 2006). Here, it is impossible to know whether any Windstream customer relied on any representations about the GRS without knowing what each customer was told about the GRS and any and all fees and surcharges generally (whether in writing or in verbal discussions) and what each customer actually relied upon in paying the GRS. Indeed, many customers doubtless paid the GRS, not because of any alleged misrepresentation by Windstream as to the nature of the charge, but because they recognized their contractual or other duty to pay surcharges such as the

---

[8] To the extent that Plaintiffs' state law claims rest upon their belief that internet services were assessed a GRS, that belief is erroneous, and any claims premised thereon are moot. (*See* Ex. A ¶ 22.)

GRS in connection with their services.

Plaintiffs' conversion claim (Count VII) likewise presents individualized questions. Conversion requires proof that the plaintiff made a demand for the return of his property and refusal of that demand. *See Ky. Ass'n of Counties, All Lines Trust Fund v. McClendon*, 157 S.W.3d 626, 632 (Ky. 2005). Contrary to the explicit terms on each of their monthly invoices instructing that any disputed amounts may be withheld, neither Plaintiff ever made a demand for return of GRS payments made before filing this action when recruited by counsel. In contrast, some customers challenged the GRS prior to the filing of this action, and Windstream addressed those questions on a case-by-case basis pursuant to established customer service channels, wholesale dispute processes, and the PSC's informal complaint procedures, all of which are sufficient to address such customer inquiries and disputes. (*See* Ex. A ¶ 25.) Only an individualized factual and legal analysis of Windstream's customer files and other information relating to specific customers could reveal whether any customer made a sustainable demand regarding the GRS that was unjustly refused.

Further, by attempting to include all Windstream customers assessed the GRS, Plaintiffs fail to account for the unique positions of each customer. Wholesale carrier and large enterprise retail customers, for example, typically have consultants, entire departments, or internal personnel devoted to scrutinizing their monthly invoices and the relevant tariffs on a timely basis for the express purpose of identifying any incorrect or improper charges. (Ex. A ¶ 7.) Such customers are acutely aware of the billing dispute provisions of the tariffs and/or their contracts, which the Court has declined to enforce here, at least so far. (*See id.*) When considering the dispute resolution provisions of the tariffs, such customers are far more analogous to a party that voluntarily enters into a contract that limits the time in which suit may be brought, and such

contracts are routinely enforced.  *E.g.*, *MFS Int'l, Inc. v. Int'l Telecom., Ltd.*, 50 F. Supp. 2d 517, 522–23 (E.D. Va. 1999).  Indeed, many of Windstream's contracts, including its current terms and conditions of service, include dispute resolution provisions.  (Ex. A.2–5.)  Including any of the foregoing customers in a class would be improper.  *See Pop's Pancakes*, 251 F.R.D. at 680 (rejecting as overly broad a proposed class that would include all persons assessed an administrative fee, as such a class would improperly include persons to whom the fee was disclosed and those who negotiated or otherwise agreed to the fee).  Quite simply, if Plaintiffs could successfully argue that the general terms and conditions of the federal tariffs govern their claims, and insofar as they seek to represent customers indisputably governed by the federal tariffs, Plaintiffs should be bound by the dispute provisions set forth in those tariffs.  As Plaintiffs' claims relate to the application of the GRS to Plaintiffs' services, and the relevant federal tariff provisions subject such claims to local billing arrangement (for Plaintiffs, Windstream's terms and conditions), Plaintiffs are subject to the dispute provisions set forth in the terms and conditions.  Either way, Plaintiffs cannot purport to represent a class of customers that would include many customers who simply do not occupy a position similar to that of Plaintiffs with respect to Windstream.

 2. ***The Availability of Affirmative Defenses Against Plaintiffs and Other Putative Class Members Renders Class Treatment Improper.***

The presence of affirmative defenses should be considered in determining whether class certification is proper.  *See Rodney v. Northwest Airlines, Inc.*, 146 Fed. Appx. 783, 786–87 (6th Cir. 2005); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295 (1st Cir. 2000) ("we regard the law as settled that affirmative defenses should be considered in making class certification decisions"); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321–24 (4th Cir. 2006); *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1192–94 (11th Cir. 2009).  Even

Plaintiffs' case law recognizes this principle. *See Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003). As Plaintiffs bear the burden of proof in seeking class certification, they bear the burden of proving that any potentially viable affirmative defenses could be resolved class-wide. *See Thorn*, 445 F.3d at 321–24. Plaintiffs' failure even to attempt to carry their burden here is significant, as they cannot even show that all proposed class members are governed by a single billing arrangement, much less that affirmative defenses arising from the various billing arrangements could be resolved class-wide.

Here, the timing of this lawsuit relative to the creation of the GRS gives rise to several affirmative defenses, including but not limited to the voluntary payment doctrine, waiver, estoppel, laches, the failure to mitigate damages, a customer's constructive/actual knowledge, and settlements by customers specifically including the GRS or other "stakedate" settlements. Windstream began assessing the GRS in June 2007. (Ex. A ¶ 24.) The first bill contained information regarding the new GRS in two separate locations. (*E.g.*, Ex. A.8.) Every bill in which the GRS appears contains a description of the charge, and the GRS is collected through a separate line item. (*E.g., id.*) Some customers questioned the GRS as soon as it appeared on their bills, and different customers had different reactions (ranging from accepting the charge, as in the case of two residential contacts that Windstream East received from the PSC, to formal settlements involving the GRS). (Ex. A ¶ 25.) Mrs. Bowers and Sunrise were content to pay their bills in full, including the GRS, until their counsel recruited them to be the faces of this putative class action.[9]

The voluntary payment doctrine bars a plaintiff from recovering an expenditure voluntarily made with knowledge of the facts, without proof of duress, fraud, extortion, or

_____

[9] Plaintiffs' counsel were aware of the GRS as early as 2008 from their representation of at least one other Windstream customer, and yet they waited to recruit Mrs. Bowers for this putative class action until after the conclusion of that representation and just days before the statute of limitations on the alleged tariff claims expired.

necessity. *See Am. Nat'l Assur. Co. of St. Louis v. Ricketts*, 19 S.W.2d 1071, 1072 (Ky. 1929); *Lee v. Hanna*, 70 S.W.2d 673, 674 (Ky. 1934). Numerous courts have applied this doctrine in contexts similar to those here where a telecommunications or cable provider includes a charge in a bill that the customer later challenges. *E.g., Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d 1155, 1156 (N.Y. 2003) (applying doctrine to claim seeking to recover for a late fee allegedly mischaracterized as an administrative fee); *Putnam v. Time Warner Cable of Southeastern Wis., L.P.*, 649 N.W.2d 626, 631–38 (Wis. 2002) (applying the doctrine to dismiss claims relating to late fees); *Telescripps Cable Co. v. Welsh*, 542 S.E.2d 640, 642–43 (Ga. Ct. App. 2000) (dismissing claims by class of persons disputing late charges voluntarily paid); *McWethy v. Telecomm., Inc.*, 988 P.2d 356, 357–58 (Okla. Civ. App. 1999) (dismissing claims relating to payment of late fees).

The voluntary payment of the GRS by Plaintiffs and other customers implicates additional affirmative defenses as well: (1) waiver, *see Conseco Fin. Serv. Corp. v. Wilder*, 47 S.W.3d 335, 344 (Ky. 2001) (defining waiver as the voluntary relinquishment of a known right, either express or implied); (2) estoppel, *see Barker v. Stearns Coal & Lumber Co.*, 163 S.W.2d 466, 470 (Ky. 1942) (describing estoppel as related to waiver, but requiring prejudice to the other party); (3) laches, *see Chapman v. Bradshaw*, 536 S.W.2d 447, 449 (Ky. 1976) (defining laches as delay that works a disadvantage to another); and (4) failure to mitigate damages, *see Davis v. Fischer Single Family Homes, Ltd.*, 231 S.W.3d 767, 780 (Ky. Ct. App. 2007) ("It is well-settled in this Commonwealth that a party must mitigate his damages."). Plaintiffs, and other Windstream customers, made the voluntary decision to pay their bills, in full and without dispute, for months, or even years, without questioning a charge conspicuously and expressly described in each of their monthly invoices. (Ex. A ¶ 25.) Such conduct directly implicates

affirmative defenses that rest on Plaintiffs' manifestations of intent and diligence in pursuing their claims.

Numerous courts have recognized that class certification is inappropriate when defenses such as the voluntary payment doctrine are implicated. *E.g., In re: Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 421 (D. Me. 2010); *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98–99 (S.D.N.Y. 2010) (collecting cases). Here, defenses based on the two-year delay between the imposition of the GRS and Plaintiffs' filing of this action are not theoretical possibilities that might apply to some unknown class member. To the contrary, they are directly applicable to the named Plaintiffs, and necessarily will bar the claims of other class members who noticed the GRS and/or received an explanation of the GRS and instructions on how to verify the charges on their bills and chose nevertheless to pay the GRS without questioning the charge. For instance, it is evident that Sunrise carefully reviews its bills each month—and has challenged charges appearing on the bills—and yet it raised no questions when the new charge appeared in June 2007. (*See* Ex. F, at 20–21, 49–50.) Mrs. Bowers likewise regularly reviews her bills, is a sophisticated former owner of a multi-million dollar business that transacts business via contracts with its own customers, and acknowledged that she has challenged charges in bills such as credit card bills, but did not question the GRS. (*See* Ex. E, at 9, 35.) Only an individualized factual and legal analysis of each customer's circumstances and billing arrangements, however, could confirm the applicability of the voluntary payment doctrine or other defenses based on the timing of this lawsuit to that particular customer.[10]

### D. Plaintiffs Have Not Established the Mandatory Elements of Rule 23(a).

The inherent flaws in Plaintiffs' class certification effort are confirmed by analyzing the

---

[10] If Plaintiffs' counsel's representation that they spoke with Mrs. Bowers about the GRS in February 2009 is true, Mrs. Bowers' voluntary payment of her bills, in full, for the next four months would only bolster the applicability of defenses, such as the voluntary payment doctrine or failure to mitigate damages, to her.

required elements of Rule 23.  A plaintiff seeking to certify a class must establish all four

elements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  Plaintiffs have

failed to establish, and cannot establish, any, much less all, of these mandatory elements.

### 1. *Numerosity.*

Rule 23(a)(1) requires that the class be so numerous that joinder of its members is

impracticable.  Plaintiffs argue that numerosity exists because they believe that Windstream has

many customers, and Windstream would be able to confirm this.  (*See* Pls.' Mot., at 4.)

Plaintiffs cannot simply speculate that numerosity exists.  *See Golden v. City of Columbus*, 404

F.3d 950, 965–66 (6th Cir. 2005).  Windstream agrees that it assesses the GRS to many

customers.  However, Plaintiffs' alleged tariff claims encompass only a fraction of Windstream's

entire customer base.  Moreover, Plaintiffs' numerosity argument is a glaring example of their

attempt to have the Court assume away their burden of proof in favor of certifying a class simply

because Plaintiffs say it should occur.  No element of Rule 23 can simply be presumed.  *Falcon*,

457 U.S. at 160.  As Windstream is not required to concede any element of Rule 23, the Court

should deny Plaintiffs' motion based on their failure to establish numerosity.

### 2. *Commonality.*

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  The

test for commonality is qualitative, not quantitative.  *See In re: Am. Med. Sys.*, 75 F.3d 1069,

1080 (6th Cir. 1996).  However, merely formulating questions that would be common to the

proposed class is not enough.  "[A]t a sufficiently abstract level of generalization, almost any set

of claims can be said to display commonality.  What we are looking for is a common issue the

resolution of which will advance the litigation."  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388,

397 (6th Cir. 1998).

Plaintiffs argue that commonality exists here because Windstream billed the same

"unlawful" GRS to all putative class members, causing the same injury, and entitling putative class members to the same relief. (*See* Pls.' Mot., at 5.) This gross oversimplification of Plaintiffs' claims ignores both the facts and the law. Establishing that any customer paid the GRS does little to advance any of Plaintiffs' claims, either in terms of liability, injury, or relief, and any claims as to whether the assessment of the GRS was "unlawful" hinge upon the factual and legal analysis specific to each customer, including the terms or combinations of terms governing each customer's billing arrangements.

For example, Counts I–II of the complaint are based entirely on Windstream's tariffs.[11] As set forth above, different customers purchase different services, and most customers who are assessed the GRS do not purchase regulated tariffed services. For example, a retail business customer or wholesale carrier customer that receives services pursuant to a negotiated contract would have no claim that Windstream violated its tariffs by billing the GRS due to specific contract language requiring the customer to pay surcharges. The "common" fact that this customer was assessed the GRS along with other customers who may have received regulated, tariffed services is not a fact that would advance the resolution of the litigation as a whole if established.

Nor is proof that the GRS was billed a common fact that would advance the resolution of Plaintiffs' remaining claims. Windstream assesses the GRS to a wide range of services, pursuant to guidance from the Kentucky Department of Revenue as to which services generate revenues subject to the gross revenues tax. (Ex. A ¶ 22.) Proof that the GRS was billed is not the real question with respect to the Truth-in-Billing, negligent misrepresentation, and KCPA claims. The substantive questions in resolving those claims involve the manner in which Windstream

---

[11] Count III mirrors Count I, except that it applies to the PSC tariffs. As discussed above, the Court should not consider whether to certify a class for Count III while that Count is stayed.

described the GRS and whether any customer relied on those descriptions. Answering these questions would involve a factual and legal analysis of individual contracts, tariffs, terms and conditions, customer treatment history, and direct communications between Windstream and specific customers involving the GRS to determine the scope of Windstream's characterizations of the GRS to individual customers. The Court has ruled that the uniform billing messages regarding the GRS are not misleading. (*See* 12/2/10 Op., at 3.) Determining whether other representations were made that may have been misleading necessarily contemplates an individualized analysis.

In simplest terms, the "common" questions identified by Plaintiffs are not the types of questions that establish commonality. Answering the question of whether a customer was assessed the GRS does nothing to advance the Plaintiffs' claims in this litigation in any respect.

### 3. *Typicality.*

Rule 23(a)(3) requires Plaintiffs to show that their claims are "typical" of those of the class. "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. The typicality analysis determines whether the relationship between the named plaintiff's injury and the conduct affecting the class as a whole is such that the challenged conduct is truly of a "collective nature," i.e., whether the plaintiff's injury is directly related to a wrong to the overall class. *Am. Med. Sys.*, 75 F.3d at 1082 (quotation omitted). Thus, to establish typicality, Plaintiffs must show that "in pursuing [their] own claims, the named plaintiff[s] will also advance the interests of the class members." *Id.*; *see also Adams v. Federal Materials Co., Inc.,* 2006 U.S. Dist. LEXIS 92539, at *16 (W.D. Ky. Dec. 19, 2006) (indicating that typicality is lacking if proof of the named plaintiff's claims does not necessarily prove the claims of the class).

Typicality is lacking here because neither Mrs. Bowers nor Sunrise could prove the

claims of other Windstream customers by virtue of proving their own claims. Neither Plaintiff, for example, could establish a tariff-based claim for a Windstream customer that purchases contractual services or services governed by Windstream's terms and conditions. Indeed, as application of the GRS to Plaintiffs' services is governed by Windstream's terms and conditions, Plaintiffs cannot establish a tariff-based claim for their own services, let alone other customers who may actually subscribe to regulated services governed by the tariffs. Nor could either Plaintiff establish the claims of others for negligent misrepresentation or violations of the KCPA because these claims would turn on questions of what each customer was actually told about the GRS, and thus what they reasonably relied upon in paying the GRS. Proof of one customer's conversion claim has no bearing on the claim by another customer because it is an individualized question of whether any customer demanded a refund of the GRS. Proving any of Plaintiffs' individual claims would not necessarily prove that claim for any other customer included in the proposed class, which is contrary to the fundamental "as goes one, so go all" principle underlying typicality.

### 4. Adequacy.

The final mandatory element of Rule 23(a) is adequacy, which asks whether the named plaintiff is an adequate representative of the putative class. "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). "'[A] class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" *Id.* at 625–26. "The adequacy of representation requirement is of particular importance because inadequate representation would infringe upon the due process rights of absentee class members who are bound by the final judgment of the suit." *Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683, 686 (D. Kan. 2007). *See also Am. Med. Sys.*, 75 F.3d at 1083.

There are two basic criteria to determine adequacy: (1) whether the named plaintiff has common interests with the unnamed class members and (2) whether the named plaintiff will "vigorously prosecute the interests of the class through qualified counsel." *Senter v. GMC*, 532 F.2d 511, 524–25 (6th Cir. 1976).[12]  As with all other elements of Rule 23, Plaintiffs must prove adequacy—it cannot simply be presumed. *See Gilmore v. Southwestern Bell Mobile Sys.*, 210 F.R.D. 212, 219–20 (N.D. Ill. 2001).

First, Plaintiffs cannot possibly represent a class that would include any of Windstream's wholesale customers or any of its retail business customers receiving services pursuant to individually negotiated contracts.  Quite simply, Plaintiffs, both retail customers, cannot possibly have suffered an injury comparable to any injury suffered by customers receiving services pursuant to individually negotiated contracts for reasons discussed at length above.  Moreover, Plaintiffs simply are not similarly situated to wholesale customers that are carriers themselves and occupy very different positions in their relationships with Windstream than do retail customers like Plaintiffs.  Plaintiffs' sole link to the federal tariffs is the End User Access Service reflected in the SLC charge.  These FCC-approved *charges* are assessed as an incident to *local* service, and they are nothing like the detailed *services* for *interstate* access services set forth in the remaining sections of the FCC tariffs.  The treatment of Plaintiffs' FCC-approved charges, including specifically the application of the GRS to the SLC, is governed by Plaintiffs' local billing arrangements with Windstream and not the same federal tariff terms and conditions that Plaintiffs seek to enforce that apply to other customers.  (*See* Ex. A.6.)  Plaintiffs, who are assessed FCC-tariffed end user service charges simply because they purchase local service do not share the same interests with respect to the FCC tariffs as those customers who actively and

---

[12] The addition of Rule 23(g) in 2003 dispenses with the need to consider adequacy of counsel as part of the Rule 23(a)(4) analysis. *See* 2003 Advisory Committee Notes, Fed. R. Civ. P. 23(g).  Nevertheless, as the standards essentially are the same, adequacy of both Plaintiffs and their counsel are discussed together here.

voluntarily purchase interstate access services pursuant in all respects to the tariffs.

Additionally, wholesale and enterprise retail customers purchasing federally tariffed services

regularly scrutinize their bills and the applicable tariffs, and dispute the charges assessed,

entering into frequent settlements and similar agreements in the regular course of business.  (Ex.

A ¶ 11.)  A customer like Mrs. Bowers, who claims not to have seen the GRS until her counsel

recruited her, is nothing like a wholesale carrier or enterprise retail customer that actively

evaluates and consistently addresses billing issues with Windstream.

Second, Plaintiffs have failed to prove their adequacy in this action due to credibility

concerns.  Credibility is crucial for class representatives.  *See Roe v. Bridgestone Corp.*, 257

F.R.D. 159, 168 (S.D. Ind. 2009); *Searcy v. eFunds Corp.*, 2010 U.S. Dist. LEXIS 31627, at

*16–18 (N.D. Ill. Mar. 31, 2010) (same).  *See also Taub v. Glickman*, 1970 U.S. Dist. LEXIS

9352, at *7 (S.D.N.Y. 1970) (discussing improper conduct of the plaintiff's counsel in finding a

lack of adequacy).  Class counsel are subject to a "heightened standard" of review in evaluating

their qualifications because, if a class is certified, the Court effectively will create an attorney-

client relationship between those counsel and the absent class members and make those class

members litigants in an action of which they may have no knowledge.  *See Huston v. Imperial*

*Credit Consumer Mortg. Inv. Corp.*, 179 F. Supp. 2d 1157, 1167 (C.D. Cal. 2001) (citing

*Palumbo v. Tele-Communications, Inc.*, 157 F.R.D. 129, 132–33 (D.D.C. 1994)).  Here, either

Mrs. Bowers or her counsel have misrepresented the circumstances under which they filed this

action.

Mrs. Bowers only took issue with the GRS because her counsel told her about it and

recruited her for this lawsuit.  (*See* Ex. E, at 25–26, 43–44.)  She initially testified that she

learned of the GRS from counsel and then saw the charge in her next bill in July or August

2009—after the suit was filed.  (*See id*. at 44.)  This initial testimony that Mrs. Bowers was recruited for this lawsuit highlights the fact that she did not file any prior complaint regarding the GRS with Windstream, the PSC, or anyone else.  At her counsel's prompting, Mrs. Bowers recanted in favor of a more vague assertion that she must have learned of the GRS before the litigation.  (*See id* at 48.)  However, she also testified that she kept most of her bills after learning of the GRS and provided them to counsel.  (*See id*. at 44–45, 48–50.)  The oldest bill that Mrs. Bowers produced is from August 2009—consistent with her initial testimony.

Mrs. Bowers' shifting testimony raises questions as to her credibility and the circumstances under which she filed this action.  Her changing testimony alone puts her adequacy as a class representative into question.  *See Beck v. Goldberg*, 1995 U.S. Dist. LEXIS 9978, at *13 (S.D.N.Y. July 13, 1995) (discussing inadequacy of a plaintiff who changed his testimony regarding when he learned of his cause of action after realizing his initial testimony provided a date after the complaint was filed).  *See also Roe*, 257 F.R.D. at 168; *Searcy*, 2010 U.S. Dist. LEXIS, at *18.  Moreover, based on the testimony and the documents, it appears that Mrs. Bowers blindly allowed her counsel to file a class action in her name without bothering to see if Windstream East had actually charged her the GRS.  Granting of *carte blanche* authority to counsel to file an action without even bothering to determine first whether Windstream East had even assessed the GRS to Mrs. Bowers is not adequate representation.  *See Beck*, 1995 U.S. Dist. LEXIS, at *13.

Adding to the adequacy problems presented by Mrs. Bowers' shifting testimony are her counsel's efforts to supplement her testimony.  After Mrs. Bowers offered two versions of the circumstances under which this action was filed, her counsel offered a third, claiming that they discussed the GRS with Mrs. Bowers in February 2009—months earlier than Mrs. Bowers

testified in her sworn deposition that any discussions occurred and months before Plaintiffs' counsel have represented that they entered into a retainer agreement with Mrs. Bowers for this matter (which occurred in June 2009). (*See* Ex. G.) Counsel openly conceded, however, that they do not have the bill that they claim to have discussed with Mrs. Bowers and offered no proof supporting their effort to contradict her testimony. (*See id.*) The fact that Mrs. Bowers and her counsel cannot offer consistent testimony as to how this action was filed raises adequacy concerns for the same reasons that Mrs. Bowers' shifting testimony itself impairs her adequacy.

### E. Plaintiffs Have Failed To Satisfy Any of the Requirements of Rule 23(b).

In addition to proving that all four elements of Rule 23(a) are satisfied, Plaintiffs also must prove at least one of the three elements of Rule 23(b). Despite the inherent incompatibility of these three provisions, Plaintiffs claim that all three are satisfied here. In fact, Plaintiffs can prove none of the Rule 23(b) criteria here.

#### 1. Plaintiffs Have Not Proven the Requirements of Rule 23(b)(1).

Plaintiffs first invoke Rule 23(b)(1)(A)'s allowance of certification if the prosecution of separate actions would create a risk of inconsistent or varying adjudications for individual class members that would establish incompatible standards of conduct for the opposing party. Plaintiffs' "support" for their Rule 23(b)(1) argument is a bare citation to *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) for the proposition that certification is proper in cases involving utilities. (*See* Pls.' Mot., at 7.) Plaintiffs fail to note the actual language from *Amchem*, which states in pertinent part that this provision "takes in cases *where the party is obliged by law to treat the members of the class alike* (a utility acting toward customers; a government imposing a tax)." *Amchem*, 521 U.S. at 614 (quotation omitted, emphasis added). As already established, Windstream is a utility, but it is not required to treat, and does not treat, all customers alike in the context of this action, as some customers will be subject to one or more tariffs, others will be

subject only to individually negotiated contracts, others will be subject to terms and conditions, and still others will be subject to some combination of the foregoing. For example, under Kentucky law, Windstream, as a telephone utility operating in a competitive industry, may treat customers differently depending on whether the customers subscribe to de-tariffed or tariffed services. *See* KRS 278.544. The fundamental premise of certification under Rule 23(b)(1)(A) is lacking.

## 2. *Plaintiffs Have Not Proven the Requirements of Rule 23(b)(2).*

Rule 23(b)(2) allows certification when the opposing party has acted or refused to act on grounds generally applicable to the class, making final injunctive or corresponding declaratory relief appropriate with respect to the class as a whole. The presumption in a class certified under this provision is homogeneity of the interests of the class members, which makes blanket relief without the opportunity for class members to opt out appropriate. *Coleman v. GMAC*, 296 F.3d 443, 447 (6th Cir. 2002).[13] On the other hand, claims for damages implicate the Seventh Amendment and Due Process concerns in the class context. *See id.* at 448. Notably, while some courts have allowed classes to be certified under Rule 23(b)(2) when damages are involved, the Supreme Court has cast serious doubt on such decisions, holding that there is "at least a substantial possibility" that a class seeking any monetary damages can be certified only under Rule 23(b)(3). *See Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994). In any event, "close scrutiny is necessary if money damages are to be included in any mandatory class in order to protect the individual interests at stake and ensure that the underlying assumption of homogeneity is not undermined." *Coleman*, 296 F.3d at 448. Thus, at a minimum, "certification under Rule 23(b)(2) is proper only when the *primary* relief sought is declaratory or injunctive."

---

[13] Under Rule 23(b)(3), the Court must give notice to members of a class certified under Rule 23(c)(2)(B)(v) giving them the opportunity to opt out of the class. No such right exists for classes certified under Rule 23(b)(1) or (2).

*In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005) (emphasis added); *see also Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000) (holding that the rule does not apply to cases in which monetary relief is predominant).

Plaintiffs do not even attempt to establish that certification would be proper under Rule 23(b)(2). They do nothing more than cite the Rule. (*See* Pls.' Mot., at 7.) This hardly satisfies Plaintiffs' burden of proof. Moreover, it is evident from the amended complaint and the nature of their claims that Plaintiffs primarily seek monetary damages. Each count of the amended complaint includes a specific demand for damages. (*See* Am. Compl. ¶¶ 60, 64, 72, 86, 97, 104, 108.) By contrast, the "injunctive" relief sought only appears in the prayer for relief, and consists of a generic demand that Windstream's "unlawful conduct" be enjoined. (*Id.*, Request for Relief ¶ C.) Certification of an injunction class under Rule 23(b)(2) is improper when the only injunctive relief at issue is a generic demand that is clearly secondary, at best, to Plaintiffs' demand for monetary relief.

### 3. *Plaintiffs Have Not Proven the Requirements of Rule 23(b)(3).*

To obtain certification under Rule 23(b)(3), Plaintiffs must establish that common questions of law or fact predominate over individual issues and that a class action is the superior method of adjudication for the claims at issue. Predominance and superiority "ensure that certification is granted only where the adjudication of common issues in a single action will achieve judicial economies and practical advantages without jeopardizing procedural fairness." *Rothwell v. Chubb Life Ins. Co. of N.A.*, 191 F.R.D. 25, 29 (D.N.H. 1998). Plaintiffs fail to meet those requirements here, and it bears repeating that Plaintiffs do not possess a common interest in the tariffs with other customers they are attempting to represent because Plaintiffs' services are deregulated services subject to Windstream's terms and conditions.

a.    ***Common Issues Do Not Predominate.***

Predominance is a "far more demanding" inquiry than commonality under Rule 23(a)(3) and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In re: Jackson Nat'l Life Ins. Co. Premium Litig.*, 193 F.R.D. 505, 509 (W.D. Mich. 2000) (quoting *Amchem*, 521 U.S. at 623).  "Although common questions need not be dispositive of the entire class action . . . their resolution should at least provide a definite signal of the beginning of the end." *Mertens v. Abbott Laboratories*, 99 F.R.D. 38, 41 (D.N.H. 1983) (citation omitted).  In simplest terms, "[c]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

Even assuming the existence of any genuine, common questions, they would be overwhelmed here by the multitude of individualized inquiries required to resolve any of Plaintiffs' claims.  First, with respect to Counts I and II, the Court would need to identify each Windstream customer who was billed the GRS *and* evaluate factually and legally whether each customer received any services subject to the general terms and conditions of Windstream's federal tariffs at any time during the proposed class period (or whether, for example, they received services pursuant to an individually negotiated contract).  This evaluation would require at a minimum a detailed analysis of each customer's file, billing records, and the terms and conditions of that customer's billing arrangement with Windstream.  This file-by-file analysis would swamp any common analysis.

As discussed above, individualized issues also would predominate Plaintiff's non-tariff-based claims due to essential questions of reliance underlying the negligent misrepresentation

and KCPA claims, and questions regarding whether any customer demanded repayment of the GRS for the conversion claim.

Significantly, as established above, Windstream has a multitude of affirmative defenses available to it on the facts of this case. Windstream began assessing the GRS in June 2007. The GRS was not simply an imperceptible increase to a generic "fee for services." It was clearly identified and explained in multiple locations on the first bill in which it appeared, and is explained in every bill since that time. (*E.g.*, Ex. B.1.) Some residential *and* business customers noticed the charge on their bills and promptly raised any questions or concerns with Windstream. (Ex. A ¶ 25.) In contrast to these customers, Plaintiffs made no contact with Windstream whatsoever until their lawyers solicited them to serve as the faces for a class action. Plaintiffs paid their bills without dispute for two years (Mrs. Bowers) and three years (Sunrise). Many other customers did likewise. As Mrs. Bowers stated in her deposition, different customers likely review their bills in different detail. (Ex. E, at 26.) The timing of this action raises individualized questions of the applicability of the doctrines of voluntary payment, waiver, estoppel, laches, and failure to mitigate damages. These are not theoretical defenses that might exist against some unidentified class members—they are concrete defenses that are implicated by the named Plaintiffs' actions and are almost certain to apply to many other customers as well.

Additionally, the billing dispute provisions contained in the various sources of the terms governing customers' relationships with Windstream raise additional individualized questions. Customers such as Windstream's wholesale carrier customers that actively purchase tariffed services and actively seek to bring any disputes pursuant to the tariff's billing dispute provisions should be held to the terms of those tariff dispute provisions the same as a customer that contracts to limit the time in which an action may be brought. Customers who have contracts

containing billing dispute provisions plainly should be held to the terms of their agreements. *See MFS*, 50 F. Supp. 2d at 522–23; Ex. A.2–3. Customers who have purchased services pursuant to Windstream's terms and conditions should be held to the billing dispute provisions contained in those terms and conditions, including the monthly invoice terms, as these terms serve the save function as a contract between the parties. *See MFS*, 50 F. Supp. 2d at 522–23; Ex. A.4–5. Determining the appropriate terms to apply to a given customer with respect to a particular service, particularly those terms affecting the manner and timing of any disputes, can only be completed on an individualized basis.

b. ***A Class Action is Not Superior.***

A class action also is not the superior method of resolving this litigation. The Court did not believe that referral of this matter to the FCC was necessary. However, this conclusion does not mean that FCC proceedings, Windstream's existing customer service channels, or the PSC's established informal complaint procedures, would not be superior to a class action to address the matters at issue here, particularly when the customers actually operating pursuant to the tariffs that Plaintiffs seek to enforce are a fraction of Windstream's customer base. Windstream's customer service channels and informal complaint procedures at the PSC and FCC establish processes for handling customer disputes of the type at issue here. (Ex. A ¶ 25.) Indeed, some customers (but not Plaintiffs) used such established channels to timely question the GRS. (*Id.*)

Courts regularly recognize the superiority of administrative channels to the class action device. *Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521, 532 (D. Md. 2001) ("[A]llowing for the pursuit of claims in the administrative forum is often deemed superior to aggregating all the claims into a class action suit."). Formal and informal complaint processes using Windstream's processes or those of the FCC and/or PSC present a ready means of resolving any disputes regarding the GRS. Some customers successfully exercised these very

channels for relief. (Ex. A ¶ 25.) Permitting the FCC and the PSC to address issues such as those presented here also would ensure consistency in the regulatory treatment of matters within the expertise of these agencies. This is especially true with respect to the appropriate treatment of End User Access Services as being subject to local arrangements, in contrast to access services addressed in the federal tariffs. Given the multitude of problems in attempting to certify a class in this action, the established administrative processes are a far superior means of resolving this dispute and are equipped already to handle the individualized analysis that is necessary to factually and legally analyze Plaintiffs' claims as to other customers.

**F.      Plaintiffs Bear the Burden of Notifying the Members of Any Certified Class.**

Because Plaintiffs have failed to satisfy their burden to prove that class certification is appropriate, it is unnecessary to consider their demand that Windstream provide notice to the class of any certification decision. If the Court were to certify any class, however, it would be inappropriate to saddle Windstream with any costs of notifying the class. Plaintiffs bear the burden of financing their case, including the costs of providing any notice of class certification to class members. *See Oppenheimer Fund v. Sanders*, 437 U.S. 340, 356 (1978). Plaintiffs have made no effort to show why the costs of notice should be shifted to Windstream.

**V.      CONCLUSION**

For the reasons stated herein, Plaintiffs' motion for class certification should be denied. Windstream respectfully requests the opportunity to appear before the Court for a brief oral argument and/or evidentiary hearing to ensure that it is given a full and fair opportunity to address the matter of class certification.

Respectfully submitted,

/s/ Joseph L. Hamilton
Joseph L. Hamilton (jhamilton@stites.com)
Mark R. Overstreet (moverstreet@stites.com)
Marjorie A. Farris (mfarris@stites.com)
Chadwick A. McTighe (cmctighe@stites.com)
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202
Phone:  (502) 587-3400
Facsimile:  (502) 587-6391
*Counsel for Defendants, Windstream Kentucky*
*East, LLC and Windstream Kentucky West, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via the ECF system for the United States District Court for the Western District of Kentucky, on this 16th day of May, 2011, which will send an electronic notice to:

David T. Royse, Esq.
D. Randall Gibson, Esq.
Douglas F. Brent, Esq.
Deborah T. Eversole, Esq.
STOLL KEENON OGDEN PLLC
2000 PNC Plaza
500 W. Jefferson St.
Louisville, KY 40202
*Counsel for Plaintiff*

/s/ Joseph L. Hamilton
Joseph L. Hamilton