UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

Dana Bowers and Sunrise Children's Services,
Inc., on Behalf of Themselves and
Others Similarly Situated,

PLAINTIFFS

v.

Windstream Kentucky East, LLC

and

Windstream Kentucky West, LLC,

DEFENDANTS.

CIVIL ACTION NO. 3:09-CV-440

**ELECTRONICALLY FILED**

## RESPONSE TO PLAINTIFFS' MOTION
## TO DEFINE THE CLASS MORE SPECIFICALLY[1]

Plaintiffs continue to misunderstand or mischaracterize Windstream's arguments and continue to cite inapplicable law.  Contrary to Plaintiffs' central argument, Windstream has never argued that a carrier can violate its federal tariffs (by contract or otherwise) *if the tariffs apply*.  Plaintiffs refuse to acknowledge or address in any meaningful way the complexity of answering the questions of when and how a federal tariff applies to any particular customer, service, or charge.  As a result, they overstate the applicability of the filed rate doctrine to this action.

Whether the gross receipts surcharge ("GRS") can be assessed to a customer without including the charge in Windstream's federal tariff, which Plaintiffs claim can never be done, depends entirely on the facts and circumstances surrounding each customer's relationship with

---

[1] As this matter is before the Court on Windstream's motion to reconsider the Court's October 12, 2011 Opinion and Order regarding class certification, Windstream incorporates by reference its memoranda in support of its motion to reconsider [DN 83, 85], and its memorandum in response to Plaintiffs' motion for class certification.  [DN 51.]

Windstream. Plaintiffs' effort to certify a class rests on the core erroneous conclusion that if the FCC requires a single charge to be included in a federal tariff, then all other charges (such as the GRS) somehow become subject to the tariff. This conclusion has no basis in the law.

Even if Windstream improperly assessed the GRS to certain wholesale customers who purchased only tariffed, *inter*state services such as switched access or special access service (which Windstream denies), neither named Plaintiff can represent such customers because Plaintiffs are retail customers who purchase deregulated, *intra*state services that are not subject to Windstream's federal tariff. The mere fact that the federal tariff contains a subscriber line charge ("SLC") due to FCC requirements does not change the nature of Plaintiffs' services, nor does it render the non-SLC charges assessed to Plaintiffs, including the GRS, subject to the federal tariff.

Further, even if the tariff applied to Plaintiffs as they insist it does, then there still are numerous material differences between Plaintiffs and the wholesale customers that they seek to represent, including the serious conflict of interest raised by Plaintiffs' desire to ignore the billing dispute provision of the tariff that required them to raise any dispute within thirty days. The interest of wholesale carrier customers that not only follow Windstream's tariff dispute provisions, but have similar provisions in their own tariffs that they enforce, is flatly contrary to Plaintiffs' interest here. This is but one of the multiple material differences between Plaintiffs and members of the class that they seek to represent. Plaintiffs cannot represent a class that includes wholesale customers or any other class.[2]

---

[2] Windstream respectfully renews its request for a hearing on class certification. A more thorough examination into the intricacies of the regulation and deregulation of the telecommunications industry, as well as the different scenarios pursuant to which Windstream customers sign up for, receive and are charged for telecommunications services is warranted.

## I.   BACKGROUND

### A.   The GRS.

Windstream is allowed to recover the costs of KRS 136.616(2)(b)'s gross revenues tax from customers using a separate, line-item surcharge.  *See BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 500–01 (6th Cir. 2008).  Nothing in *BellSouth* requires Windstream or any other carrier to list a surcharge designed to recover the costs of the gross revenues tax in a federal tariff.  Instead, Windstream and other carriers are allowed to recover the costs of the tax from their customers through any non-discriminatory and accurately-described means.

In *Irwin Wallace v. AT&T Communications of the Southern States, Inc.*, 6 FCC Rcd 1618 (1991), the FCC concluded that AT&T was required to list a surcharge to recover the costs of a Florida gross receipts tax in its federal tariff.  *See id.* ¶ 6.  The FCC concluded that the tax at issue was not extrinsic to communications services, but instead was a cost of doing business imposed on AT&T that needed to be recovered through AT&T's rates.  *See id.*  Because AT&T was required by 47 U.S.C. § 203(a) to set forth *all* rates for *inter*state services, and because AT&T imposed the surcharge on *inter*state customers prior to listing the charge in its federal tariff, the FCC concluded that AT&T violated its federal tariff.  *See id.*  Nothing in *Irwin Wallace* indicates that AT&T would have been required to tariff the surcharge prior to assessing it to customers purchasing services *not* subject to AT&T's federal tariff.[3]

Windstream uses a line-item surcharge, the GRS, to recover the costs of the gross revenues tax.  (Rhoda Af. ¶ 21 [filed under seal with DN 51].)  The GRS assessed to each customer is calculated based on a percentage of the charges billed to the customer that produce

---

[3] Windstream disagrees that the reasoning of *Irwin Wallace*, which dealt with a Florida tax, applies to the Kentucky tax here due to the unique nature and origins of Kentucky's tax, which replaced municipal franchise taxes that previously were not subject to federal tariffing requirements.  As the Court appears to disagree with this distinction, however, and because the issue is not material to the point being made here, Windstream notes its position solely to preserve the record.

revenues subject to the gross revenues tax.  (*Id.* ¶ 22.)  Windstream did not raise its monthly charge for services to recover the cost of the tax, nor did it assess a flat, line-item surcharge to every customer to recover the overall cost of the tax.  Instead, it tied the assessment of the GRS to the different revenue streams that the Commonwealth uses to calculate the overall tax that Windstream pays.  (*See id.* ¶ 22.)  This method of assessing the GRS aligns the tax recovery with the revenues that are included in the tax assessment, applies in a non-discriminatory manner, and complies with Windstream's tariffs, contracts, and other arrangements governing its relationships with its customers.  (*See id.*)

### B. Not All Charges Are Required To Be Tariffed.

To understand what is permitted by *BellSouth* and why *Irwin Wallace* is inapplicable here, it is critical to understand deregulation.  Before the Telecommunications Act of 1996, carriers like Windstream were required to tariff charges for all interstate services.  47 U.S.C. § 203(a).  Prior to 2006, carriers in Kentucky were required to tariff charges for all intrastate services.  KRS 278.160(1).  Thus, historically, a customer's relationship with Windstream would be governed by two possible sources: a federal tariff for interstate services and a state tariff for intrastate services.

Windstream's services are no longer governed by only two sources.  At the interstate level, the FCC has exercised its power under the 1996 Act to eliminate tariff requirements for some interstate services.  *See Castro v. Collecto, Inc.*, 634 F.3d 779, 786 (5th Cir. 2011) (discussing and citing to FCC de-tariffing orders).  In Kentucky, Windstream has elected to be governed by the alternative regulation scheme established in 2006, which eliminates many tariff requirements for intrastate services.  *See* KRS 278.541 to 278.544.  Accordingly, while federal or state tariffs still govern certain services, Windstream can, and does, provide both interstate and intrastate services pursuant to a range of possible arrangements.  (*See* Rhoda Af. ¶¶ 3–19.)  Many

customers receive different services under different arrangements (*e.g.*, a carrier may enter into an interconnection agreement with Windstream under 47 U.S.C. §§ 251–252, but the same carrier also may purchase interstate switched access service under the federal tariff). (*See id.*) Many customers who purchase multiple types of services receive a single bill for all services. (*See* Rhoda Af. ¶ 8.)

**C.    "End User Access Services" are Nothing Like Interstate Switched and Special Access Services.**

The next step in the analysis is understanding the types of services that remain subject to federal tariffs: access services. The Sixth Circuit has held that FCC regulations "provide for *two basic forms of interstate access*, switched access and special access." *See Ohio Bell Tel. Co. v. FCC*, 949 F.2d 864, 867–68 (6th Cir. 1991) (emphasis added). And, yet, Plaintiffs correctly note that Windstream's federal tariff identifies three access services: switched access, special access, and "end user access." Did the Sixth Circuit err in its description of the law? Has Windstream somehow created a new form of access service? The answer to both questions is no. The Sixth Circuit is correct that there are only two basic forms of true access service, as so-called end user access service is an entirely different matter.

Interstate switched access and special access services typically are purchased by wholesale carrier customers (*e.g.*, a Verizon or a Time Warner) to serve their own end user customers. (*See* Rhoda Af. ¶¶ 4–7.) Some wholesale customers purchase only these services and do so pursuant to Windstream's federal tariff. (*See id.* ¶ 7.) Some also purchase other services from Windstream pursuant to different arrangements, such as negotiated contracts. (*See id.* ¶¶ 4–6.) It is undisputed that neither Plaintiff has ever purchased switched access service or special access service from Windstream.

End user access services, by contrast, are "services" in name only.  The end user "access service" applicable to Plaintiffs in this case is what is known as the SLC (also referred to as an "end user common line charge" or "EUCL").  No customer would contact Windstream to purchase the SLC.  Instead, the SLC is assessed to customers like Plaintiffs when they purchase local, intrastate service.  The FCC created the SLC to help carriers recover the costs of maintaining the interstate loop, or the network that supports interstate service, to which a customer gains "access" by purchasing local, intrastate services because the same communications facilities are used for interstate and intrastate telecommunications.  *See Nat. Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1113–15 (D.C. Cir. 1984).  The SLC is set forth in Windstream's federal tariff because the FCC establishes the amount of the SLC and requires the amounts to be set forth in the tariff.  Unlike switched access or special access services that carriers intentionally purchase, however, end user access charges are incidental to a customer's purchase of local, intrastate services, which services are not subject to Windstream's federal tariff, and the terms governing the assessment of the SLC are subject to Windstream's local billing arrangements with the customers.  (*See* Ex. 6 to Rhoda Af.)

### D.  Plaintiffs Compared To Other Windstream Customers.

Plaintiff Bowers is a retail residential customer of Windstream East who purchases Feature Pack A, a bundled package of local, intrastate telecommunications services.  (Caballero Af. ¶ 2 [DN 7–3].)  As a local, intrastate service, Feature Pack A is not included in Windstream's federal tariff, nor is it required to be.  Solely because she purchases local, intrastate services, Mrs. Bowers is assessed the federal SLC.  (*See id.* ¶ 3.)  Plaintiffs do not dispute the amount of the SLC assessed to Mrs. Bowers, nor do they claim that Mrs. Bowers purchases any switched access or special access services.

Plaintiff Sunrise is a retail business customer who purchases local, intrastate telecommunications service from Windstream East and Windstream West. (Rhoda Af. ¶¶ 17–18.) Sunrise is assessed the SLC because it purchases these local, intrastate services. (*Id.*) Plaintiffs do not dispute the amount of the SLC assessed to Sunrise, nor do they claim that Sunrise purchases any switched access or special access services.

In contrast to Plaintiffs, some wholesale carrier customers and retail business customers purchase interstate switched access and special access services pursuant to Windstream's federal tariff. (Rhoda Af. ¶¶ 4–11.) Unlike Plaintiffs, whose only connection to the federal tariff is the assessment of the FCC-established SLC, these customers actively purchase tariffed switched and special access services to enable them to serve their own customers or multiple office locations of their own operations. (*See id.*) In other words, while Plaintiffs' payment of the SLC is akin to payment of a shipping and handling charge incidental to the purchase of a product (*i.e.*, the intrastate service), the interstate switched and special access services set forth in the federal tariff are the actual "product" purchased by these larger wholesale and some retail business customers.

Wholesale carrier customers scrutinize their bills from Windstream, and they routinely lodge disputes according to the terms of the tariff and follow the tariff's requirement that billing disputes be brought within thirty days. (*See id.* ¶¶ 7–10.) Indeed, many carriers have their own tariffs that include billing dispute provisions that they doubtless want to see enforced. (*E.g.*, Excerpts from tw telecom Tariff FCC No. 1, attached as Ex. A; Excerpts from Verizon Tariffs FCC Nos. 1, 11, 16, attached as Exhibits B, C, and D, respectively.) While both Plaintiffs have received monthly invoices since the GRS was established in June 2007 that clearly describe the GRS, neither of them ever questioned the charge until counsel recruited them for this action. By contrast, a number of carriers followed the tariff dispute provision and entered into settlement

agreements specifically resolving disputes over the GRS or "stakedate" settlements that mutually resolve all disputes existing with Windstream as of a certain date. (*See* Rhoda Af. ¶¶ 10–11, 25.) As of April 2011, Windstream was tracking approximately 10,000 active wholesale disputes. (*Id.* ¶ 10.)

## II.    ARGUMENT

### A.    Plaintiffs, Not Windstream, Bear the Burden of Proof On Class Certification.

"Particular care" is required when deciding whether to certify a class action in part due to the "huge amount of judicial resources" that they consume. *Pipefitters Local 636 Insurance Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis original). Rule 23(c)(1)(B) requires any order certifying a class to define the class and the claims, issues, and defenses to be litigated class-wide. Plaintiffs' burden necessarily includes proving that there is an adequate class definition and that there are claims, issues, and/or defenses that can be resolved class-wide.

Unable to meet their burden of proof, Plaintiffs continue to invert the burden of proof and dance around which claims, issues, and defenses they want to resolve class-wide. Plaintiffs only recently seem to have settled on a class definition, having previously indicated a desire for a class of all Windstream customers that were assessed the GRS.[4] They now retreat somewhat to ask for a class of all "customers" who: (1) have received "interstate access services" under Windstream's federal tariffs since June 1, 2007 (specifically including "end user access

---

[4] It is disingenuous for Plaintiffs to assert that this case has "never" involved Windstream's contract customers because, until recently, they sought a class of *all* customers that have paid the GRS—which necessarily would include contract and other non-tariff customers. (*See* Pls.' Mot., at 4 n.3.)

services," "switched access services," and "special access services"); and (2) were assessed the GRS. (*See* Pls.' Mot., at 3.) Plaintiffs' purported narrowing of the proposed class does not save their invalid assertion that resolving their claims relating to the assessment of the GRS would resolve the claims of the proposed class.

Ignoring their burden of proof (as well as the extensive evidence that Windstream has presented), Plaintiffs rely heavily on non-binding cases that predate *Wal-Mart* for the apparent proposition that Windstream must disprove at least some aspects of the propriety of class certification, such as whether there are conflicts between Plaintiffs and members of the class. (*See, e.g.*, *id.* at 7–8 [citing *In re: Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 337 (W.D. Mich. 2001)] and 16 [citing *In re: South Central States Bakery Products Antitrust Litig.*, 86 F.R.D. 407, 418 (M.D. La. 1980)]).  Even if such cases could have been persuasive in the past, they cannot survive *Wal-Mart*'s unequivocal holding that a plaintiff must prove the propriety of class certification.

While Plaintiffs would prefer a presumption of certification and require Windstream to prove otherwise, that simply is not the law.  Plaintiffs must prove the elements of Rule 23.  For example, Plaintiffs must prove that they are part of the proposed class, share the same interests as the class, and have suffered the same injury as the class.  *Wal-Mart*, *supra*, 131 S. Ct. at 2550; *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 625–26 (1997).  Plaintiffs must prove that there is at least one common issue "capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *See Wal-Mart*, 131 S. Ct. at 2550.  Plaintiffs also must prove that their claims are typical of the class such that "in pursuing [their] own claims, [they] will also advance the interests of the class members."  *In re: Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir.

1996).  Plaintiffs have done none of these things, and they cannot continue to ask the Court to require Windstream to disprove their overly-broad, simplistic, and conclusory assertions.

**B.  Plaintiffs Cannot Represent Wholesale Customers Because Establishing Whether the GRS is Appropriate For Plaintiffs Has No Bearing On Whether It is Appropriate For Wholesale Customers, and There are Inherent Conflicts Between Plaintiffs and Wholesale Customers.**

In its January 24, 2012 Memorandum Opinion and Order, the Court described the issues on which it desired additional briefing.  The Court noted that Windstream argued, among other things, that any class ultimately certified could not include customers that have settled claims with Windstream or customers purchasing services pursuant to contracts.  (*See* 1/24/12 Op., at 2.)  The Court also identified Windstream's arguments that Plaintiffs have not shown that their claims are the same as those held by members of the proposed class, and that whether the GRS is appropriate depends on the many possible arrangements under which customers purchase services.  (*See id.*)  Plaintiffs' motion does not assuage these crucial concerns.

**1.  *Whether the GRS is Properly Assessed To Plaintiffs Has No Bearing On Whether It is Properly Assessed To Wholesale Customers or Any Customer Purchasing Interstate Switched or Special Access Services.***

The Court has described the "central and common issue" in this action as "whether and to what extent Defendants improperly charged and collected the GRS."  (10/12/11 Op., at 4.)  Plaintiffs portray this question erroneously as one that can be answered solely by looking at Windstream's federal tariff.  They argue that all customers in their newly-defined class purchase "access" services under the federal tariff, and, therefore, the propriety of the GRS is a singular question that can be resolved through proof of Plaintiffs' individual claims.  This assertion is unsupported and incorrect.

The tariff cannot "define the class," as Plaintiffs claim, because what must be tariffed for one customer does not necessarily need to be tariffed for another and because different customers

purchase services from Windstream in a variety of ways. That is the critical feature of deregulation, as it no longer can be said that all customers of a telecommunications provider must be treated the same. Plaintiffs' newfound reliance on an allegedly common bond of "access service" does not cure the flaws in their proposed class. The end user access "services" that Plaintiffs are assessed are FCC-regulated charges assessed solely because Plaintiffs purchase local, *intra*state services. Plaintiffs' local, intrastate services are not tariffed and are not required to be. By contrast, wholesale customers and some retail enterprise business customers intentionally purchase tariffed, *inter*state switched or special access services so that they can serve their own customers or locations within their own operations.

The illogic of Plaintiffs' argument that they are qualified to represent customers purchasing interstate switched or special access service may be seen in an illustration involving two hypothetical Windstream customers: a retail customer purchasing local, intrastate services and a wholesale carrier purchasing interstate switched access services.

a.      *The Retail Customer.*

Consider a retail customer (like Plaintiffs) who purchases only local, non-basic, intrastate services. As a matter of law, these *intra*state services have never been described in Windstream's federal tariffs and are not required to be. *See* 47 U.S.C. § 203(a) (requiring tariffing of *inter*state and international services). It is undisputed that the rates for services that Windstream charges this customer are without regard to its federal tariff. Because of FCC regulations, however, Windstream adds the SLC to this customer's bills. *See NARUC*, *supra*, 737 F.2d at 1113–15 (discussing the SLC). By law, the amount of the SLC must be set forth in the federal tariff. However, this does not somehow convert the customer's local, intrastate services into ones that are governed by the federal tariff. Indeed, as recognized in the tariff itself, the terms and conditions of service for this customer are subject to the local billing arrangements

the customer has with Windstream.  (Rhoda Af. Ex. 6.)

        b.       *The GRS As Applied To the Retail Customer.*

For the retail customer, Windstream could recover the cost of the gross revenues tax in any number of ways, for example, by increasing a monthly $30 charge to $31.  It is beyond dispute that this would not implicate Windstream's federal tariff because the charges for the customer's local services are not subject to the federal tariff.  Similarly, Plaintiffs could not reasonably argue that simply adding a $1 GRS to the customer's bill, consistent with *BellSouth*'s permitting use of a line item charge, would implicate the federal tariff.  In neither of these situations has Windstream "increased the cost of [the customer's] access service over the prices stated in the tariff," which is what Plaintiffs allege is the common injury to the class.  (*See* Pls.' Mot., at 5–6.)  The overall cost of the customer's un-tariffed, *intra*state services may be higher, but the cost of the so-called "end user access service" remains the same.  Instead of adding $1, however, Windstream opted to correlate the amount collected through the GRS to the cost of the tax by using a variable GRS calculated based on a percentage of the charges on each customer's bill that generate revenues subject to the tax.  (*See* Rhoda Af. ¶ 22.)  Because Kentucky taxes revenues derived from the SLC, the *amount* of the SLC is included in determining the GRS assessed to this customer, but the SLC itself is unaltered.  (*See id.*)  The result is no different than if Windstream simply increased a monthly service rate of $30 to $31 to recover the cost of the gross revenues tax.  Such a change would not implicate Windstream's federal tariff, and it is not implicated in this case.

        c.       *The Wholesale Customer.*

Consider, on the other hand, a wholesale carrier customer who purchases interstate switched access service from Windstream to enable the carrier to serve its own customers.  This carrier may purchase interstate switched access service exclusively under the terms and

conditions set forth in Windstream's federal tariff. The charges assessed to this carrier for such interstate services are set forth in Windstream's federal tariff. 47 U.S.C. § 203(a). This carrier actively and intentionally purchases interstate services with knowledge (actual or imputed) of the tariff terms that govern those services. Neither Windstream nor the customer can add to, delete from, or otherwise alter the tariff terms for this customer's services (which would include any tariffed billing dispute provisions). *See AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 221–27 (1998).[5] Unlike the situation with the retail customer, the tariff is the exclusive source of the relationship between this carrier and Windstream.

      d.     *The GRS As Applied To the Wholesale Customer.*

This wholesale customer arguably presents a different case than that of the retail customer when it comes to the GRS. Under *BellSouth*, Windstream can recover the cost of the tax from the second customer, and it can do so through a line-item charge like the GRS. Under *Irwin Wallace*, one may argue that Windstream would first need to add the GRS to its federal tariff that governs the terms and conditions under which this carrier customer purchases interstate services.[6] In an abundance of caution, Windstream amended its federal tariffs to include the GRS.

Critically, *Irwin Wallace* cannot be read to require that every surcharge like the GRS must be included in a federal tariff. The Court erred in concluding otherwise in granting summary judgment to Plaintiffs and in relying on that conclusion in certifying a class. *Irwin*

---

[5] Plaintiffs cite to *AT&T* as somehow refuting the impact of the Telecommunications Act of 1996 on this action because *AT&T* was decided after the passage of the Act. (*See* Pls.' Mot., at 12–14.) This once again misrepresents Windstream's arguments, because Windstream has never asserted that a tariff can be violated *when the tariff applies*. The point that Plaintiffs refuse to acknowledge—but tellingly never overtly dispute—is that tariffs are no longer the only means by which a telecommunications carrier can establish charges for its services. Indeed, the hypothetical wholesale customer used in this example (one that purchases *only* tariffed services) would be quite rare, as most customers purchase a range of services from Windstream and are invoiced for their collective services in a single bill.

[6] As noted above, Windstream disagrees that the reasoning of *Irwin Wallace* applies here.

*Wallace* merely holds that if *all* charges must be tariffed, then a surcharge to recover taxes like those at issue in *Irwin Wallace* must be tariffed as well.

<blockquote>

e.      *The Analysis of Whether the GRS is Proper Differs For a Retail Customer Versus a Wholesale Customer.*

</blockquote>

Plaintiffs pretend that the first and second customers in the above scenario are similarly situated. It takes little effort to see that this premise is inherently flawed. The fundamental feature of a class action is that proving the named plaintiff's claim will prove the class claims. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998). That is not the case here. Proof that the GRS was or was not appropriate as to Plaintiffs, whose only connection to the federal tariff is the fact that they are assessed the SLC because of their local, intrastate services, has no bearing on the propriety of the GRS for switched or special access customers who purchase interstate services under the federal tariff (much less to such wholesale customers who purchase services pursuant to contracts or other arrangements). This does not even account for the multitude of additional differences between the wide range of customers that Windstream serves or the fact that the wholesale customers with which Plaintiffs pretend to be similarly situated may in fact have similar surcharges assessed to their own customers or most notably have their own tariff billing dispute processes that they would seek to enforce in a manner similar to Windstream. (*See generally* Defs.' Resp. to Mot. for Class Cert. [DN 51] and Defs.' Mot. to Reconsider[DN 83, 85].) Windstream again refers the Court to the largely unchallenged affidavit of Michael Rhoda, filed under seal with Windstream's response to Plaintiffs' motion for class certification [DN 51], for a detailed discussion of the types of arrangements under which Windstream provides services and other matters relating to class certification.

### 2. There are Inherent Conflicts of Interest Between Wholesale and Retail Customers.

Plaintiffs wish to ignore manifest conflicts of interest between themselves and the class that they seek to represent in order to assert that they are adequate class representatives. While Plaintiffs' fallback is the oft-asserted plea that anyone who dislikes the class can always opt out, the right to opt out of an action does not allow the Court to disregard Rule 23 that Plaintiffs must affirmatively prove before a class can be certified.

It is hard to imagine that any of the carriers Plaintiffs' counsel represent in other matters (as they reference in touting their experience) would agree with Plaintiffs' assertion that assessing a single tariffed charge, like the SLC, would effectively prevent a carrier from assessing any un-tariffed charge. Any such charge, in Plaintiffs' view, necessarily would "increase[] the cost of [a customer's] access service over the prices stated in the tariff." (*See* Pls.' Mot., at 5–6.) No wholesale carrier who sells any intrastate services subject to the SLC would agree with this conclusion, which is the necessary result of accepting Plaintiffs' position.

Also, Plaintiffs are retail, end user customers purchasing local, intrastate services who seek to stand in the shoes of wholesale carrier customers or large retail enterprise customers who unlike Plaintiffs: (1) actively purchase interstate switched and special access services under Windstream's federal tariff; (2) may have their own tariffs to enforce; (3) may operate also pursuant to individually negotiated and/or arbitrated agreements with Windstream; (4) may employ billing departments and/or consultants to review their bills; and (5) may purchase services from Windstream solely to serve their own end users or their own retail enterprise operations. Retail end users like Plaintiffs and wholesale carrier customers have very different interests in applying the filed rate doctrine. For example, Plaintiffs' counsel have advocated elsewhere on behalf of wireless carriers (who may be wholesale customers of Windstream) that

terms of a filed tariff *cannot* defeat the terms of an interconnection agreement (a contract)—the direct opposite of the argument they advance here on behalf of Plaintiffs that a tariff is inviolate and cannot be altered by contract. (*See* CMRS Providers' Joint Post-Hearing Brief, at 55, relevant portions of which are attached as Ex. E.)

Additionally, Plaintiffs insist that they can enforce provisions of the federal tariff that they like while ignoring provisions that they do not, in particular, the thirty-day billing dispute provision. Windstream will not restate the arguments and law supporting its position that it is improper to allow a party to pick and choose the provisions of a tariff that she wishes to see enforced. While the Court may disagree with Windstream, it is all but certain that Windstream's wholesale customers would not take that position. As reflected in Exhibits A–D, many of the carriers that Plaintiffs seek to represent have billing dispute provisions in their own tariffs that they doubtless wish to see enforced, but that Plaintiffs argue here are invalid. These same carriers follow the billing dispute provisions of the tariff, and those that specifically questioned the GRS did so when they disputed the GRS.

Plaintiffs cannot simply disregard conflicts such as those discussed above and argue, contrary to the established burden of proof, that Windstream must seek out conflicts and prove that Plaintiffs cannot adequately represent the class.

3. ***There are Additional Conflicts Between Plaintiffs and Wholesale Customers, Including the Presence of Affirmative Defenses Against the Claims of Wholesale Customers That Do Not Exist Against Plaintiffs.***

Windstream's wholesale carrier customers operate in the same complex world of regulated and deregulated services in which Windstream operates. Wholesale carrier customers scrutinize their invoices and regularly dispute charges—there are literally thousands of active disputes at any given time—pursuant to the billing dispute provisions of Windstream's tariff, and they also routinely enter into stakedate settlements to mutually resolve all existing claims. (*See*

Rhoda Af. ¶¶ 7–11.)  Some of these customers specifically questioned and settled disputes involving the GRS.  (*See id* ¶ 25.)

The unique positions occupied by interstate switched and special access customers give rise to unique considerations and defenses.  No customer that has settled a dispute concerning the GRS, whether directly or through a stakedate or other settlement can be part of any class to assert claims involving the GRS.  *See Cole v. Asurion Corp.*, 267 F.R.D. 322, 332 (C.D. Cal. 2010).  Release is an affirmative defense, and one who releases a claim not only has no damages, but has no claim to assert at all.  *See* Black's Law Dictionary 430 (7th ed. 1999).  There can be no finding of liability against Windstream on behalf of a settling customer.[7]

Additionally, even if the Court concludes that the tariff's thirty-day dispute provision cannot be enforced against retail customers like Plaintiffs, which Windstream disputes, the Court should not hold likewise for wholesale customers.  A tariff is both a contract and the law.  *City Messenger Serv. of Hollywood, Inc. v. Capital Records Distributing Corp.*, 446 F.2d 6, 7 (6th Cir. 1971).  Parties may agree by contract to shorter periods in which disputes may be brought than otherwise provided by statute.  *Ord. of United Commercial Travelers v. Wolfe*, 331 U.S. 586, 608 (1947).  Even if retail customers somehow were excused from following the terms of the tariff, wholesale customers have their own tariffs (which often include dispute provisions) and are well aware of, and follow, the dispute provisions in Windstream's tariff.  Such customers should be treated like contracting parties that have agreed to the shorter limitations period even if there were some reason to negate the tariff as to retail customers.  *See MSF Int'l, Inc. v. Int'l*

---

[7] Plaintiffs continue to attack Windstream for redacting settlement agreements, but they fail to describe any additional information that they need.  Plaintiffs do not need to know the names of customers, and the *Agreed* Protective Order expressly permits Windstream to redact customer-identifying information.  Plaintiffs have no need to review terms resolving disputes that do not involve the GRS.  Nor do Plaintiffs have any legitimate need to know the dollar amount of any settlement.  Plaintiffs' complaints over settlement redactions are simply another groundless effort to malign Windstream.

*Telecom Ltd.*, 50 F. Supp. 2d 517, 523 n.14 (E.D. Va. 1999) (holding that, even if a contractual provision requiring billing disputes to be addressed within thirty days did not exist, the tariff provision to the same effect would bar claims brought after that time). Plaintiffs cannot claim adequately to represent such customers.

Finally, wholesale customers purchase a much greater volume of services than Plaintiffs and, therefore, pay a much larger GRS. Any wholesale customers who have not already settled their claims have more than ample incentive to seek individual relief. A key purpose of class certification—aggregating smaller claims—thus is lacking here, making certification inappropriate. *See Pipefitters*, 654 F.3d at 631–32.

### C. Plaintiffs Cannot Represent a Class of "End User Access" Customers.

Presumably, Plaintiffs would argue that they should be allowed to represent a class of customers purchasing "end user access services" even if they cannot represent switched and special access customers. As discussed above and in prior briefing, Plaintiffs' theory of liability requires the Court to conclude that assessing the FCC-established SLC somehow converts all of a customer's services into federally-tariffed services. This is not, and cannot be, the law. Any "end user" class that Plaintiffs seek to represent would contain residential and business customers who purchase services pursuant to a wide range of possible arrangements, each of which may have different implications on whether the GRS can be assessed to that customer. The allegedly "unifying" effect of the federal tariff does not unify any claims of a proposed end user class because Windstream's liability for assessing the GRS, if any, will be subject to individualized questions regarding the terms of each customer's relationship with Windstream.

### D. The Only Issues Left To Be Resolved Are Individualized.

Assuming the Court does not revisit its earlier conclusion that the GRS must be tariffed and that Windstream violated its federal tariff, the Court still should not certify a class because

the only remaining issues would be individualized. The Court has concluded that Windstream could not assess the GRS without violating its federal tariff, which is the common question that the Court described as permitting a class action. (*See* 10/12/11 Op., at 3–4.) The only questions that remain are individualized questions such as what damages each class member could recover. In other words, the Court is being asked to certify a class for the express purpose of resolving inherently individualized questions. This is the antithesis of a class action. The Sixth Circuit has held that if a court resolves the common question in an action prior to certifying a class, then the appropriate course is to deny certification and enter a final judgment on the individual claims so that the defendant can appeal (and any class members then can decide whether to file their own actions at a later time).[8] *See Pipefitters*, *supra*, 654 F.3d at 625–31 (reversing certification, stating, in part: "Ironically, the district court ruled on the only issue that was truly 'common' and certified the questions that require individualized contract-by-contract assessment.").

Windstream believes that the Court erred in granting summary judgment to Plaintiffs. In doing so, the Court also resolved the very issue purported to be "common" to the class, and now is asked to certify a class to resolve the inherently individualized issue of damages. Plaintiffs cannot adequately represent other customers to recover individualized damages, nor can there be any questions common to Counts I and II of the amended complaint left to resolve through a class action no matter how the class is defined.

## III.    CONCLUSION

Plaintiffs now ask the Court to certify a class based on an inherently flawed assertion that they should be able to stand in the shoes of every Windstream customer because Windstream has

---

[8] There is no indication that the issue of one-way intervention was raised or considered. In any event, the case arose from a procedurally complicated setting in which objections by both parties to the magistrate judge's report and recommendation that class certification be denied were pending when the parties moved for summary judgment, and the court did not issue a written opinion.

a federal tariff that includes various "access" services. Plaintiffs have not satisfied their burden of proof by painting such overly broad, unsubstantiated strokes. Plaintiffs are nothing like the wholesale customers that they seek to represent and are not even similarly situated to other retail customers. Without a named plaintiff who can satisfy the requirements of Rule 23, there is no class. That is precisely the case here. The Court should deny Plaintiffs' motion for class certification.

Respectfully submitted,

/s/ Joseph L. Hamilton
Joseph L. Hamilton (jhamilton@stites.com)
Mark R. Overstreet (moverstreet@stites.com)
Marjorie A. Farris (mfarris@stites.com)
Chadwick A. McTighe (cmctighe@stites.com)
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202
Phone: (502) 587-3400
Facsimile: (502) 587-6391
*Counsel for Defendants, Windstream Kentucky*
*East, LLC and Windstream Kentucky West, LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served via the ECF system for the United States District Court for the Western District of Kentucky, on this 5th day of March, 2012, which will send an electronic notice to:

David T. Royse, Esq.
D. Randall Gibson, Esq.
Douglas F. Brent, Esq.
Deborah T. Eversole, Esq.
STOLL KEENON OGDEN PLLC
2000 PNC Plaza
500 W. Jefferson St.
Louisville, KY 40202
*Counsel for Plaintiffs*

/s/ Joseph L. Hamilton
Joseph L. Hamilton