UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-440-H

DANA BOWERS, et al.
PLAINTIFFS

V.

WINDSTREAM KENTUCKY EAST, LLC, et al.                    DEFENDANTS

**MEMORANDUM OPINION**

In the form of opposing motions, the Court has before it two vastly different views of how this litigation should proceed.  Plaintiffs, Dana Bowers and Sunrise Children's Services, Inc., ask the Court to issue a final certification of the class pursuant to Federal Rule of Civil Procedure 23(b)(3).  Defendants, Windstream Kentucky East LLC and Windstream Kentucky West LLC (collectively "Windstream"), oppose class certification or, in the alternative, argue to limit its scope.  They have also urged the Court to reconsider issues addressed in prior opinions.

The parties vigorously argue opposing views on some difficult issues. Consequently, the Court has reviewed all its prior rulings to correct any missteps and to establish a sound legal basis for moving forward.  This Memorandum represents the Court's careful effort to do so.

**I.**

The Court begins with a brief review of the essential facts.

Generally, the Kentucky Public Service Commission (the "PSC") regulates the tariffs charged for intrastate telecommunications services; the Federal Communications Commission (the "FCC") has authority to regulate the tariffs for interstate telecommunications services. Defendants provide intrastate and interstate telecommunications services to several hundred

thousand Kentucky customers.  They serve two broad types of customers: (1) most are individual and business retail customers who purchase the services for their own use; and (2) about five hundred (500) are wholesale customers (exclusively businesses) who purchase the services for resale. Both the PSC and the FCC regulate various aspects of Defendants' services and rates.

The background of the current dispute has its origins from 2005, when the Kentucky legislature imposed a 1.3% tax on gross revenues (the "Gross Revenue Tax," or "GRT") of telecommunications providers, such as Windstream.  Soon, litigation erupted concerning various aspects of the GRT and the telecommunications companies' right to recover it from customers. Among other things, that litigation clarified that companies were entitled to pass along the GRT to their customers and to explain the reasons for the charge.  *See generally BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499 (6th Cir. 2008).  This charge is called the Gross Receipts Surcharge ("GRS").  In June 2007, to recover the cost of the GRT, Windstream began adding the GRS to all customer bills.

The original Plaintiff in this case, Dana Bowers, is a retail customer who purchases intrastate telecommunication service from Windstream.  Every intrastate customer automatically receives access to the so-called interstate loop, which allows them to receive an interstate call. The FCC authorizes Windstream to charge a small Subscriber Line Charge ("SLC") to pay for this service.  Bowers has received this interstate access and has paid the SLC.  The other Plaintiff, Sunrise Children's Services, Inc. ("Sunrise"), is a business retail customer who also purchases intrastate services only for its own use.  Windstream also provides interstate services to retail and wholesale customers, which the parties have identified to be "switched access

2

services" and "special access services."[1]

In June of 2009, Bowers filed her six-count class action complaint which broadly alleges that without the authority of a proper federal tariff Defendants unlawfully charged the GRS to customers who paid for (1) intrastate service, (2) the SLC, (3) switched access services and (4) special access services.  Plaintiffs paid for the first two; primarily wholesale interstate customers paid for the last two.

## II.

The Court has already issued numerous rulings.

In a Memorandum Opinion dated April 29, 2010, the Court denied Defendants' motion to stay or dismiss Counts I, II, and IV on the grounds of primary jurisdiction.  The Court stayed the claims in Count III of the Complaint pending the PSC's review of two issues concerning intrastate tariffs.[2]  The Court denied Defendants' motion to dismiss the state law claims in Counts V, VI and VII.  Finally, the Court held that the two-year statute-of-limitations period provided for in 47 U.S.C. § 415 would govern Plaintiffs' claims in Counts I and II.

In a Memorandum and Order dated December 2, 2010, the Court dismissed that portion of the Count 4 "Truth-in-Lending" claim arising from allegedly misleading language.  The overcharging aspect of the claim was allowed to go forward.

In a Memorandum Opinion dated October 3, 2011, the Court held that Defendants were required to file the GRS in their federal tariffs prior to assessing it upon customers.  Furthermore,

---

[1]It is possible that customers who purchase switched access services or special access services are also charged the SLC.  However, this has not been alleged or argued by either party and does not affect the analysis in this Memorandum Opinion.

[2]On May 4, 2012, the PSC issued an order resolving these issues.

the Court determined that after amending their federal tariffs to include the GRS, Defendants could not charge an amount different than that stated in their tariffs. The Court denied the motion for summary judgment as to Counts IV, V, VI, and VII.

One week later, by a Memorandum Opinion dated October 11, 2011, the Court certified a class action pursuant to Federal Rules of Civil Procedure 23(b)(1) and (3), which consisted of all customers who were charged the GRS. Following class certification and a related conference between the parties and the Court, Defendants moved for clarification and reconsideration as to various aspects of the class certification.

On October 19, 2011, the Court decided that the case would proceed as only a Rule 23(b)(3) class action. Further, the Court recognized that Defendants disagreed with the scope of the class certified and clarified that the Order certifying the class was not final. Defendants were further deemed to have moved for reconsideration of it.

On January 23, 2012, after a further conference, the Court identified six main issues upon which Defendants had sought reconsideration. That Memorandum denied reconsideration in part, but deferred until further briefing any decision on (1) the propriety of the class certification and (2) reconsideration of its summary judgment for Plaintiff. Briefing on these issues is now complete and the Court has held another conference to discuss them. Therefore, in the current procedural context, the Court must now consider these two issues.

**III.**

In its October 3, 2011 Memorandum Opinion, the Court held that the GRS is subject to Defendants' federal tariffs and their failure to file the GRS in their federal tariffs prior to

4

assessing the charge on customers violated 47 U.S.C. § 203(c).[3]  Defendants have resurrected

discussion of these rulings, vigorously arguing that a federal tariff is not required in every

instance where the GRS is charged and that the Court's ruling was far too broad.  The Court will

address these issues now.

## A.

The Court has continually looked to the FCC's decision in the *Irwin Wallace* case for

guidance on this issue.  *In the Matter of Irwin Wallace v. AT&T Commc'ns of the S. States, Inc.*,

6 FCC Rcd. 1618 (1991).  There, the FCC found that the Florida gross receipts tax, which the

state imposed on telecommunications carriers such as AT&T, and which AT&T collected from

its customers, was "one of many expenses affecting [AT&T's] charges to its customers."  *Id*. at

1619.  Because the tax constituted a charge to customers (by way of the pass-through), and

because the tax was imposed on interstate telecommunications services (which were themselves

regulated by the FCC), it fell squarely within the realm of services regulated by the FCC.  *Id*.

As a result, the FCC concluded that AT&T had to file the tax within its federal tariffs prior to

collecting it from customers.

In its prior opinion, the Court interpreted *Irwin Wallace* to mean that any taxes imposed

directly on telecommunications carriers must be tariffed prior to billing customers.  Upon further

consideration, this interpretation was overbroad.  The FCC's conclusion in *Irwin Wallace* rested

upon two premises: (1) the characterization of the gross receipts tax (whether it was a charge to

customers); and (2) the characterization of the services upon which the tax was imposed

(whether they were interstate telecommunications services regulated by the FCC).  The second

---

[3]47 U.S.C. § 203(c) prohibits telecommunications carriers from charging customers rates not properly filed
with the FCC.  This doctrine is popularly known as the Filed Rate Doctrine.

factor, which was not at issue in *Irwin Wallace*, is significant in this case due to comprehensive deregulation within the telecommunications industry.  Because much has changed since *Irwin Wallace*, and not every interstate service is subject to a federal tariff, that case can no longer read to categorically deem all taxes imposed directly upon interstate telecommunications carriers as subject to federal tariffs.  Rather, it should be read to require that any tax which a carrier passes through to its customers, and which is assessed on federally-tariffed interstate services, must itself be filed in federal tariffs.  Therefore, the Court must determine whether Plaintiffs' claims include any such federally-tariffed services.

Plaintiffs say that the Subscriber Line Charge, or "SLC," represents such a federally-tariffed service.  Therefore, they argue, the GRS assessed in connection with it must also be federally tariffed.  Defendants argue vigorously that the SLC does not constitute a federally-tariffed service.  At best, they say, the SLC is an incidental charge on intrastate service.  It is not a service at all because a customer cannot actually purchase it or subscribe to it.  Therefore, they argue that the SLC is not an interstate service subject to federal tariffing.  By extension, Defendants conclude that the GRS as applied to the SLC is also exempt from federal tariffing. The parties, indeed, agree upon the factual underpinnings of the SLC, but they disagree on the definitions and the legal conclusions one must draw from the facts. These are novel issues of legitimate disagreement.  *Irwin Wallace* offers guidance, but not a direct answer.

No one disputes that the FCC created and regulates the SLC.  Federal regulations require a tariff for "access service" to the interstate network.  47 C.F.R. § 69.3 (WL current through July 5, 2012).  Among those access services are those defined to include "services and facilities provided for the origination and termination of interstate services, which include end user and

6

common line access."  47 C.F.R. §§ 69.2(a), 69.2(e)(1, 2) (WL current through July 5, 2012).[4]

Among those "end user charges for access" are the charges for the "End User Common Line

element."  47 C.F.R. § 69.4(a) (WL current through July 5, 2012).  The SLC is the functional

equivalent of the End User Common Line element to which the regulations refer.  The parties

agree that the charge on Plaintiffs' bills denominated as the SLC reflects the federally-tariffed

charge for this end user access service.  Thus, the SLC "charge," regardless of its name,

represents the costs associated with the network that supports access to interstate loop.

It is certainly true that this end user access service is completely unlike other FCC-

regulated interstate services.  Intrastate customers receive this access service incidental to their

purchase of local or intrastate services whether they want it or not.  It is not a "service" in the

sense that customers can choose to purchase it.  Nevertheless, it is a service that connects

intrastate customers to the interstate loop.  The charge that they pay for it is the small subpart of

their bill which is subject to federal tariffs.   To this degree, the Court concludes that the SLC is a

charge for an FCC-tariffed interstate service.

This analysis is consistent with both case law and federal regulations governing

telecommunications services.  Even customers subscribing only to intrastate services are capable

of receiving interstate calls.  These long-distance calls invariably require use of local facilities.

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1104 (D.C. Cir. 1984).  In light

of this simple truth, the Supreme Court decided more than 80 years ago that "an appropriate

---

[4] Defendants would argue that the term "access services" as referenced in the federal regulations is limited to services such as special or switched access services.  The Court, however, views that § 69.4 is clear that these services include those for the "termination of any interstate . . . communication."  Consequently, even intrastate services contain some interstate components since customers who subscribe to only local services are capable of receiving interstate calls.

percentage of local plant costs should be placed within the jurisdiction of federal rather than state regulators." *Id.* (citing *Smith v. Ill. Bell Tel. Co.*, 282 U.S. 133 (1930)).  This explains why some portions of intrastate services include interstate service charges and supports the Court's conclusion that these services, such as the SLC, are regulated as interstate services.

**B.**

For the reasons set forth above, the SLC is a charge for interstate services.  Therefore, both its charge and the charge of a tax upon it, such as the GRS, must be authorized by a federal tariff.  When Defendants imposed the GRS upon the SLC without first filing it within their federal tariffs, they violated 47 U.S.C. § 203(c).  Upon reconsideration, however, the Court concludes that it may have applied this ruling both overbroadly and somewhat prematurely.

Certainly, deregulation has changed much of the landscape.  Some interstate services may no longer require a federal tariff.  Defendants have continually argued that comprehensive deregulation within the telecommunications industry has rendered the Filed Rate Doctrine antiquated.  This Court cannot agree with so broad an assertion.  Each service must be considered independently as the Court has now done with the SLC.  Where the FCC regulates or governs services, the Doctrine still applies.  *See generally Pfeil v. Sprint Nextel Corp.*, 284 F. App'x 640 (11th Cir. 2008).  The Court finds no deregulation authority so broad as to include the SLC nor any which specifically exempts the SLC.  However, the Court limits its legal conclusions to Plaintiffs' particular claims.  Many critical facts may remain unresolved concerning the wholesale customer's purchase of interstate access services.  The Court is unaware of the precise contractual relationships which govern wholesale customers' purchases of interstate services, so the issue of assessing the GRS on switched access services and special

access services remains for later consideration.[5]

The Court will limit its summary judgment to the precise holding that Defendants were required to file a federal tariff for any GRS applied to the SLC. The Court denies summary judgment as to any other putative class claims.

## IV.

The Court previously stayed consideration of Count III of the Complaint to allow the PCS an opportunity to consider whether Defendants failed to properly amend their state tariffs to reflect the GRS before imposing it upon their intrastate service customers.

The PSC has now issued a ruling regarding Plaintiffs' state claims and Plaintiffs have moved for summary judgment on Count III.  Defendants have filed an appeal of the PSC order in Franklin Circuit Court.  Because Plaintiffs' Motion for Partial Summary Judgment is not fully briefed, the Court will refrain from considering it at this time.  Since the intrastate service claims will remain stayed, customers with those claims are not specifically included in the definition of the Proposed Class.

## V.

Next, the Court will reconsider its initial class certification.  Here, Plaintiffs propose the following class definition:

> All individuals and entities, including Interexchange Carriers and
> End Users, who, for any time during the period beginning June 1,

---

[5] During the conference, counsel for Defendants did seem to concede that the switched access and special access services are federally tariffed.  This would suggest that the assessment of the GRS upon either would require federal tariffing.

9

2007 to the present, were "Customers"[6] for interstate access services provided pursuant to Windstream Telephone System Tariff No. 6 (or predecessor Tariff Nos. 1 and 3 applicable to Windstream East and West, respectively, hereinafter collectively "Tariff No. 6"), including:

a.     Customers who purchased end user access services pursuant to Windstream Telephone System Tariff No. 6;

b.     Customers who purchased switched access services pursuant to Windstream Telephone System Tariff No. 6; and/or

c.     Customers who purchased special access services pursuant to Windstream Telephone System Tariff No. 6;

*and* who

(i)     paid any charges for a "Kentucky Gross Receipts Surcharge" or similarly designated charge that Windstream Kentucky East, LLC or Windstream Kentucky West, LLC ("Windstream") applied to the Customer's billings from June 1, 2007 through August 6, 2008; and/or

(ii)     paid any charges for a "Kentucky Gross Receipts Surcharge" or similarly designated charge that Windstream applied to the Customer's billings in an amount in excess of 1.31% after August 6, 2008;

*but excluding* Windstream, its subsidiaries, affiliates, officers and directors; any entity in which Windstream has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded party.

The Court interprets this proposed definition to include all customers who were billed the SLC and customers who purchased switched access services or special access services during the applicable period (the "Proposed Class").

---

[6] Plaintiffs propose defining "customer" as it is characterized in Windstream's applicable federal tariff: The term "Customer(s)" denotes any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this tariff, including but not limited to Interexchange Carriers ("ICs") [and] End Users . . . .

To qualify for class certification, Plaintiffs must first meet the four requirements established in Rule 23(a), frequently referred to as numerosity, commonality, typicality and adequacy of representation.  In its October 12, 2011 Memorandum Opinion, the Court considered a similar proposed class under these criteria and found all of them to be met.  The Court will now reconsider and supplement its analysis, particularly with respect to the typicality and adequacy of representation requirements.

**A.**

Rule 23(a)(1) requires that a class be so numerous that joinder of its members is impracticable.  *Turnage v. Norfolk S. Corp.*, 307 F. App'x 918, 921 (6th Cir. 2009).  There is no "strict numerical test" for making this determination, nor is there an "automatic cut-off point at which the number of plaintiffs makes joinder impractical . . . ."  *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *2 (W.D. Ky. Dec. 22, 2009) (internal quotation marks and citations omitted).  However, the "'sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1).'"  *Id*. (quoting *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004)).

According to both sides, the Proposed Class would include hundreds of thousands of Windstream intrastate customers also charged the SLC and several hundred wholesale interstate customers.  The volume of customers weighs heavily in favor of class certification.  So too does the difficulty that the parties, particularly the retail customers, would face in otherwise joining these customers as parties to this action.  For these reasons, Plaintiffs easily satisfy the numerosity requirement.

**B.**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed.
R. Civ. P. 23(a)(2) (2012).  Although the commonality requirement "speaks of 'questions' in the
plural, . . . there need only be one question common to the class."  *In re Countrywide*, 2009 WL
5184352, at *3 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)).  Not
every common question will suffice, since "at a sufficiently abstract level of generalization,
almost any set of claims can be said to display commonality."  *Sprague*, 133 F.3d at 397.  The
key is to identify "a common issue the resolution of which will advance the litigation."  *Id.*

Here, Plaintiffs identify the common question as whether Defendants, without properly
filing a federal tariff, wrongfully charged the GRS on services purchased by the Proposed Class.
Plaintiffs have narrowed the scope of their claims to three services:  end user access services or
the "SLC", switched access services, and special access services.  Defendants say the factual
issues are dissimilar because they charge for these three services in different ways and customers
acquire them differently.

For reasons articulated in Part II of this Memorandum Opinion, the SLC is a federally-
tariffed interstate service.  Plaintiffs allege that switched access and special access services are
also federally tariffed interstate services.  If true, the conceptual treatment of the GRS as to each
service will resolve the most significant legal issues in the case and is sufficient to meet the
commonality requirement.

**C.**

Next, the Proposed Class must meet the typicality requirement, the analysis of which
intertwines with that of commonality and adequacy of representation.

12

To meet this requirement, "[a] claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if [named Plaintiff's] claims are based on the same legal theory.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (rehearing en banc denied) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)).  Typicality requires "that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Sprague*, 133 F.3d at 399 (internal quotation marks and citation omitted).  It does not require that a representative's claims involve *all* the same facts or law as the class, "provided there is *a common element* of fact or law." *In re Countrywide*, 2009 WL 5184352, at *3 (quoting *Beattie*, 511 F.3d at 561) (emphasis added).

The question of typicality presents a much closer issue than the first two.  Defendants argue that end user access services are prohibitively unique from switched access or special access services.  It is true that Defendants may have certain defenses against some of the Proposed Class, both factual and legal, that are unavailable against Plaintiffs.  However, the Court sees a fundamental similarity in the conduct charge.  If Windstream charged the GRS on end user access services, switched access services, and special access services alike, and they failed to correct their federal tariffs, then the Plaintiffs' claims arise from a similar practice as that which affects the Proposed Class.  While all the facts and law pertaining to claims of the Proposed Class may not be identical, the most significant ones are.

For these reasons, the Court concludes that the interests of the few hundred wholesale customers are reasonably aligned with the interests which Plaintiffs represent directly.

13

**D.**

Rule 23(a)'s final adequacy-of-representation requirement aims to reveal conflicts of interest between named representatives and their Proposed Class. *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "There are two criteria for determining whether the representation of the class will be adequate: 1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Countrywide*, 2009 WL 5184352, at *4. Regarding the first factor, "[c]ommon questions need only predominate: they need not be dispositive of the litigation." *Id*. In assessing whether all of the claims will be vigorously prosecuted, the personal and financial interests of the representatives and their access to information should be considered but will not always be determinative. *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 214-15 (S.D. Ohio 2003); *Ingram v. Joe Conrad Chevrolet, Inc.*, 90 F.R.D. 129, 132 (E.D. Ky. 1981).

Here, Plaintiffs purchase only intrastate telephone service. Based upon this Court's rulings, their federally tariffed services are limited to the end user access services as defined in subparagraph (a) of Plaintiffs' Proposed Class. The real question is whether Plaintiffs and their counsel can fairly represent the additional several hundred wholesale customers who purchase the switched-access or special-access interstate services referenced in subparagraphs (b) and (c) of the Proposed Class. These customers purchase Windstream services for resale to *their own customers*. At first blush, it might seem unlikely that Plaintiffs could represent the claims of such a differently situated group, even though their claims have common elements.

Upon reflection, however, the Court concludes that these differences are not fatal to

14

certification of the Proposed Class.  Even though wholesale customers may have their own

billing departments and may more carefully inspect their bills than retail customers, they still

have the same general interest in paying only lawful charges.  If wholesale customers were

unlawfully charged the GRS as Plaintiffs allege, then it is immaterial whether wholesale

contracts state otherwise.  Similarly, whether a customer intends to purchase a service or

automatically purchases it incidental to other services has no bearing on the legality of the

charge itself.  True, wholesale customers' agreements may actually raise a bar or limitation to

some claims, however, they do not appear so complex and unique that Plaintiffs and their

counsel would have difficulty asserting the claims.  However, in no manner does the Proposed

Class limit or hinder Defendants from asserting any factual or legal defenses in due course of the

litigation.[7]

When evaluating the adequacy of Plaintiffs' representation, the Court must also

"determine whether class counsel are qualified, experienced and generally able to conduct the

litigation."  *In re Countrywide*, 2009 WL 5184352, at *5 (quoting *Stout v. J.D. Byrider*, 228 F.3d

701, 709 (6th Cir. 2000)).  As the Court has noted before, the firm representing Plaintiffs has

sufficient resources and experience to litigate this case.  Stoll Keenon Ogden has handled

telecommunications class actions in the past.  More importantly, they have investigated this case

thoroughly and have spent more than two years litigating it.  The Court finds Stoll Keenon

Odgen more than adequate to serve as class counsel.

For all of these reasons, though this is a close call, the Court does not believe that these

---

[7]Although the Court previously held that Defendants' statute of limitations defense against named Plaintiffs
could not abridge the Filed Rate Doctrine, this conclusion applies only to named Plaintiffs and is not generally
binding on the Proposed Class.

differences fatally impact Plaintiffs' ability to adequately represent the scope of those other interests held by the Proposed Class.

## VI.

To certify this class, Plaintiffs must also satisfy one prong of Rule 23(b).  This action is proceeding as a Rule 23(b)(3) class action which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3) (2012).   "The Rule 23(b)(3) predominance requirement parallels the Rule 23(a)(2) commonality requirement in 'that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues.'" *In re Countrywide*, 2009 WL 5184352, at *6 (citation omitted).  When analyzing predominance, "the Court must determine if the questions common to the class are 'at the heart of the litigation.'" *Id.* (citation omitted).

The overarching questions in this case are whether, and to what extent, Defendants wrongfully charged the GRS to customers who purchase certain federally-tariffed services, allegedly and more specifically, the SLC (an end user access service), switched access services, and special access services.  This issue is common to all Proposed Class members and can be resolved by focusing only on Defendants' conduct, their federal tariff, and the law governing the GRS in relation to each service.  To be sure, there are differences between the retail and wholesale customers.  But the Court does not believe that those differences will greatly impede resolution of the case.  Therefore, the class satisfies the requirement of Rule 23(b)(3).  The Court

finds all of the requirements of Rule 23(a) and (b) to be met and the Proposed Class, as defined

by Plaintiffs, is certified.[8]

## VII.

This Memorandum Opinion is just the beginning of the process for adjudicating those

claims as a class.  Many unresolved issues remain.  Fortunately, the Court has many tools at its

disposal to help deal with them.

A district court may alter or amend an order granting class certification at any time

"before final judgment."  Fed. R. Civ. P. 23(c)(1)(C) (2012).  This discretionary authority

includes the options to decertify a class or amend it to create appropriate subclasses if, for

example, it appears that the certified class is too broad or some issues are unable to be resolved

on a class-wide basis.  *See* Fed. R. Civ. P. 23(c)(5) (2012); *Newton-Nations v. Rogers*, 221

F.R.D. 509, 511 (D. Ariz. 2004); *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp.

2d 513, 547 (S.D.N.Y. 2008); *Winnett v. Caterpillar, Inc.*, No. 3:06-CV-00235, 2007 WL

2044098, at *13 (M.D. Tenn. 2007).  These powers well equip the Court to address any potential

conflicts between class members or challenges to class certification.

Because Defendants so vehemently oppose Plaintiffs' Proposed Class definition, the

Court emphasizes that certification of a class is not the death knell to Defendants' contention that

retail customers and wholesale customers should not be part of the same class.  Although

Plaintiffs' Proposed Class will be certified, the Court recognizes, to Defendants' well-argued

points, that the inclusion of wholesale customers in the certified class could potentially present

---

[8]In their Response to Plaintiffs' Motion to Define the Class More Specifically, Defendants request a hearing
on class certification.  Because the Court has performed a separate analysis on the new class definition, Defendants'
request will be denied.

challenges in the future.  For example, discovery into the claims of wholesale customers may reveal defenses against these claims arising from contracts held between Windstream and wholesale customers.  Similarly, it may be the case that some of the legal principles governing wholesale customers are different than those governing retail customers.  Some members of the certified class may have additional state-law causes of action, which could furthermore complicate matters.  For all of these reasons, the Court emphasizes that it will revisit the scope of class certification at a later time if necessary.  The facts presently before the Court, however, weigh in favor of certifying Plaintiffs' Proposed Class.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record